**UNITED STATES of America, Appellee,**

v.

**Alexander L. GUTERMA and Robert J. Eveleigh, Defendants-Appellants, and**

**F. L. Jacobs Co., Comficor, Inc., and Chatham Corporation, Defendants.**

**No. 362, Docket 26198.**

United States Court of Appeals
Second Circuit.

Argued June 7, 1960.

Decided July 18, 1960.

Emanuel Eschwege, New York City, for defendant-appellant Eveleigh.

Jerome J. Londin, Exec. Asst. U. S. Atty., David P. Bicks, Asst. U. S. Atty., New York City (Morton S. Robson, Chief Asst. U. S. Atty., and George I. Gordon, Asst. U. S. Atty., New York City, on the brief), for appellee.

Richard H. Wels, New York City (James L. Adler, Jr., Gabriel Galef and Moss, Wels & Marcus, New York City, on the brief), for defendant-appellant Guterma.

Before LUMBARD, Chief Judge, and CLARK and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge.

Alexander L. Guterma and Robert J. Eveleigh appeal from a judgment of the District Court for the Southern District of New York which convicted them, after a jury trial, of various offenses under § 32 of the Securities Exchange Act of 1934 and of conspiracy, under 18 U.S.C. § 371, to violate the Securities Exchange Act and to defraud the United States by impeding and attempting to defeat the lawful functions of the Securities and Exchange Commission, all with reference to F. L. Jacobs Co., a company whose common stock was registered with the SEC under the Securities Exchange Act and listed on the New York Stock Exchange. Appellants were indicted along with Jacobs, which first pleaded guilty and later *nolo contendere,* and Comficor, Inc. and Chatham Corporation, alleged to be personal holding companies of Guterma, which were convicted on certain counts but have not appealed. The trial took all or part of 34 days. We have concluded that the judgment convicting Guterma and Eveleigh should be affirmed with two exceptions: Guterma's conviction on Count 2 relating to his failure to file an "insider's report" (Form 4) for January, 1959, and the conviction of both appellants on Count 9 relating to their alleged willful hindering of the filing of a current report (Form 8–K) of Jacobs for January, 1959.

The indictment, which was in 21 counts, related to various matters concerning Jacobs, whose business had been that of a subcontractor for automotive parts. In March, 1956, Guterma acquired 20,000 Jacobs shares of a total of 875,622 and became chairman of the board of directors; in the following years he acquired large additional amounts of stock and received stock options. Eveleigh became vice president,

treasurer and a director of Jacobs; he also owned stock and held stock options in Jacobs and assisted Guterma in the operation of Comficor and Chatham Corporation. During 1958, under Guterma's direction, Jacobs acquired all or a controlling interest in a number of other companies. On December 4, 1958, the New York Stock Exchange suspended trading in the stock of Jacobs because of the company's failure to file its annual report for the fiscal year ended July 31, 1958, on October 31, 1958 as required.

The indictment, found on March 16, 1959, contained 21 counts. These can be divided into three categories:

(a) Counts 1–4 and 10–20 charged willful violations of the requirements of § 16(a) of the Securities Exchange Act, 15 U.S.C.A. § 78p(a), for the filing of so-called insider reports (Form 4) by officers, directors or beneficial owners of more than 10% of any class of an equity security registered on a national securities exchange within 10 days after the close of any month in which any change in such ownership occurs. Counts 1 and 2 charged failures by Guterma to file reports allegedly required of him as an officer and director of Jacobs for December, 1958, and January, 1959; Counts 3 and 4 charged similar failures by Eveleigh for the same months. Counts 10–20 charged the failure of Comficor, Guterma and Eveleigh to file reports allegedly required from Comficor as a 10% beneficial owner of Jacobs' stock for each month from December, 1957, through July, 1958, and from November, 1958, through January, 1959. Count 4 against Eveleigh was dismissed during the trial with the government's consent.

(b) Counts 5–9 charged violation of the corporate reporting requirements of § 13(a) of the Securities Exchange Act, 15 U.S.C.A. § 78m(a). Count 5 charged that Guterma and Eveleigh willfully, knowingly and without just cause hindered, delayed and obstructed the making and filing of Jacobs' annual report (Form 10–K) for the fiscal year ending July 31, 1958, which § 13(a) of the Act and SEC Rule X–13A–1 required to be filed with the SEC within 120 days after the close of the fiscal year. Counts 6, 7, 8 and 9 charged that Guterma and Eveleigh willfully, knowingly and without just cause hindered, delayed and obstructed the making and filing of current reports (Form 8–K) which § 13(a) (1) of the Act and SEC Rule X–13A–11 allegedly required of Jacobs for September, November and December, 1958 and January, 1959, because of its disposition of a significant amount of assets in each such month. The Court dismissed Counts 6, 7 and 8 for lack of proof of dispositions during the respective months of assets sufficient to require an 8–K report, rejecting the government's contention that transactions in various months could be cumulated to meet the quantitative test in the SEC instructions which we shall discuss below in connection with Count 9.

(c) Count 21 charged all five defendants with conspiring with each other and four other individuals to violate §§ 16, 20 and 32 of the Securities Exchange Act and to "defraud the United States by impeding, impairing, obstructing and attempting to defeat the lawful functions of an agency of the United States of America, namely, the Securities and Exchange Commission, in the protection of the investing public," by failing to file or obstructing and delaying the filing of the reports previously referred to and by filing reports of Jacobs "which were false and misleading with respect to material facts and which contained omissions of material facts."

The jury found all defendants guilty on all the counts that had been submitted to it. The judge sentenced Guterma to two years on each of Counts 1, 2, 5 and 9, to one year on each of Counts 10 through 20, and to four years and eleven months on the conspiracy count, the sentences to be served concurrently, and imposed fines of $10,000 on each of the 16 counts. He sentenced Eveleigh to one year on each of Counts 3, 5, 9 and 10 through 20, and to two years and eleven months on the conspiracy count, the sentences to be

served concurrently, and imposed a $10,-000 fine on the conspiracy count.

■■■ (1) A major contention of appellants relates to the denial of their motion to strike paragraph 7 of the conspiracy count which we set forth in the margin,[1] to the admission of evidence under that paragraph, and to the judge's charge concerning it. The motion to strike was correctly denied. The government had charged a conspiracy not to file required reports and to defraud the government of the lawful functioning of the SEC for the protection of investors by such failure and by the filing of false and misleading reports, see Hammerschmidt v. United States, 1924, 265 U.S. 182, 44 S. Ct. 511, 68 L.Ed. 968; it was relevant for the government to show that the conspiracy was motivated by a scheme to appropriate assets of Jacobs for defendants' benefit and to demonstrate what the facts were that defendants allegedly wished to conceal from the SEC and the public. There is somewhat more in appellants' contention that so much of the trial was devoted to these transactions as to have created a hazard that the jury might be led into thinking that the looting of Jacobs was the substantive offense of which defendants were indicted; although the judge's charge analyzed the evidence on each substantive count, appellants contend that what might otherwise have been the helpful effect of this was nullified by a passage, near the end of the charge, in which the judge dwelt at length on the transactions as to which the government had offered proof under paragraph 7 of the conspiracy count. Indeed, appellants claim this passage enhanced the risk that the jury would convict on all counts for the acts proved under paragraph 7. However, the judge made the bearing of this evidence clear by adding, immediately after the criticized passage, "Considering these matters and others, which you no doubt have in your minds, you must determine if the conspiracy charged existed"; and the only criticism of this portion of the charge made at the time was met in a manner stated to be satisfactory by counsel for Comficor who was the only one to take exception. Moreover, whatever the situation might be in a trial presenting a close issue of fact, the government's case on the conspiracy count and on Count 5, relating to obstructing the filing of the 10–K report, was overwhelmingly established; we are reversing the conviction on Count 9 relating to the failure to file the Form 8–K report for January, 1959; and we see no basis for belief that the jury did not decide the entirely different issues with respect to the failure to file insider reports on the evidence pertinent to those counts alone.

■■ (2) Another general claim of appellants is that the statutory and regulatory scheme on which the substantive counts · are based is so vague and indefinite as to contravene the Fifth and Sixth Amendments when invoked in a criminal prosecution. There is nothing vague or indefinite in the requirement for filing an annual report, and we do not reach the constitutional question with respect to the requirement for filing current reports in view of our reversal of the conviction of this count on another ground. Thus there remain only the attacks on § 16(a) relating to insider reports. These seem to reduce themselves to two. One relates to the phrase requiring a report of "any change in such ownership during such month"; this is asserted to be too vague, at least as ap-

1. "7. It was further a part of said conspiracy that the defendants Alexander L. Guterma, Robert J. Eveleigh, F. L. Jacobs Co., Comficor, Inc., Chatham Corporation, and co-conspirators Austin J. Hare, Salvatore R. Pavis, Garland L. Culpepper, Jr., and Seymour B. Lipton would transfer, assign, pledge, hypothecate, and otherwise encumber and subject to primary and contingent liabilities and cause to be transferred, assigned, pledged, hypothecated, and otherwise encumbered and subjected to primary and contingent liabilities, assets of F. L. Jacobs Co., for the purpose of making the assets and the credit of F. L. Jacobs Co. available for the use, benefit and unjust enrichment of defendants Alexander L. Guterma, Robert J. Eveleigh, Comficor, Inc., and Chatham Corporation."

plied to the facts here where, in many instances, the "change" occurred through sale by a pledgee. The other, in the case of the Comficor counts, 10–20, related to the phrase "the beneficial owner of more than 10 per centum of any class of any equity security." We find no merit in these contentions; indeed, they border on the frivolous. As said by Chief Justice Hughes in Sproles v. Binford, 1932, 286 U.S. 374, 393, 52 S.Ct. 581, 587, 76 L.Ed. 1167, "The requirement of reasonable certainty does not preclude the use of ordinary terms to express ideas which find adequate interpretation in common usage and understanding." [2]

■ (3) Reserving other general objections for later discussion, we turn to a review of the substantive counts. Here we can immediately dispose of Count 5, the charge of intentionally delaying the filing of Jacobs' annual report, as to which the proof was so overwhelming and the criticisms of the judge's charge so wholly unmeritorious as to make comment supererogatory.

■ *Count 1, Guterma Form 4 Report, December, 1958:* The government supported Count 1 by testimony of Morton Carlin, President of Judson Commercial Corporation, which had made loans to Guterma secured, among other things, by a pledge of Jacobs' stock, that in December, 1958 his company sold 4,600 shares of such stock through a broker; this was not contradicted. The question was whether Guterma knew of the sale. Carlin testified that he was in constant touch with Guterma and Eveleigh and also with Lipton, originally an employee of Guterma, who had become assistant treasurer of Jacobs but continued to keep Guterma's books and handled the details of his loan transactions. The court fairly reviewed this evidence and the defendants' criticisms of the charge are baseless.

*Count 2, Guterma Form 4 Report, January, 1959:* The government relied on two transactions, a sale of 3,000 shares by Judson Commercial Corporation, and a sale of 20,000 shares by Netherlands Trading Company as trustee for a concern known as UFITEC, these being a portion of 30,000 shares which Guterma had pledged as collateral to UFITEC. If the government had relied solely on the UFITEC sale, we would affirm despite appellants' contention that the sale was unauthorized. Whether it was in fact so may be debatable; but we regard this as immaterial since, the securities being negotiable, the sale effected a change in Guterma's beneficial ownership, Guterma was fully aware of what had occurred, he made no protest until the SEC charged him with failure to report, and the judge charged, perhaps too favorably to Guterma, that if Guterma honestly believed that the stock had been sold by UFITEC in breach of an agreement, the jury could consider this on the issue of willfulness. However, the two transactions were submitted to the jury together and we cannot know whether their verdict was based solely on the UFITEC transaction or in part or solely on the Judson Commercial sale. See United New York and New Jersey Sandy Hook Pilots Ass'n v. Halecki, 1959, 358 U.S. 613, 619, 79 S.Ct. 517, 3 L.Ed.2d 541. As to the latter, Carlin testified to sales of 3,000 of Guterma's shares in January, 1959; but it was brought out on cross-examination that the proceeds of these sales had been credited not to Guterma

2. Equally without merit is the contention that § 16(a) offends the due process clause of the Fifth Amendment because it does not apply to beneficial owners of, or to officers or directors of issuers of, "an exempted security," which, as defined in § 3(a) (12), 15 U.S.C.A. § 78c (a) (12), includes not only certain defined securities but such others "as the Commission may, by such rules and regulations as it deems necessary or appropriate in the public interest or for the protection of investors, either unconditionally or upon specified terms and conditions or for stated periods, exempt from the operation of any one or more provisions of this title which by their terms do not apply to an 'exempted security' or 'exempted securities.'" See Yakus v. United States, 1944, 321 U.S. 414, 427, 64 S.Ct. 660, 88 L.Ed. 834.

but to Comficor and that the error was not corrected until the summer or fall. While other testimony by Carlin could be interpreted as meaning that the facts were accurately shown in statements currently sent to Guterma's office, a sharp issue was created whether Guterma knew in January or February that these 3,000 shares were his, and therefore whether his failure to report the sale was willful within § 32(a). However, the charge omitted any reference to this Comficor complication, the judge denied a request to clarify this, and the prejudice was heightened by the fact that in discussing this count the judge said, "Carlin also testified that Guterma came to the Judson office and was personally told about the sales * * *" which, while correct as a general statement, had been specifically disclaimed as regards any personal conversation with Guterma as to the ownership of the 3,000 shares sold in January. To be sure, there is a certain unreality in supposing that the jury would remember these details from a charge taking nearly a hundred pages of the typewritten transcript; but so long as we observe the rite, we must serve it faithfully.[3]

*Count 3, Eveleigh Form 4 Report, December, 1958:* The government introduced a letter dated December 23, 1958 signed by Eveleigh to the Silver Company reciting his delivery of 2,000 shares of Jacobs stock "which I have requested you to sell for my account" and requesting payment of the proceeds, and testimony that Jerry Pressman of the Silver Company on the same day sold the shares and gave Eveleigh a check for the proceeds and that Eveleigh deposited the check in his bank account. Eveleigh countered with evidence that, shortly thereafter, he instructed his bank to transmit a slightly larger amount to another bank for the account of Jacobs. Pressman testified that when Eveleigh did this, Eveleigh remarked to him "Look what I have to do with my money." Any factual issue with respect to this count was fairly put to the jury.

*Counts 10–20, Guterma and Eveleigh, Comficor-Form 4 Reports:* The convictions on counts 10–20 relating to Comficor's failure to file Form 4 reports raise two general questions, one of law and the other of fact.

The question of law concerns what types of shares are to be considered in determining "any class of any equity security (other than an exempted security) which is registered on a national securities exchange," to which the 10% test of § 16(a) of the Securities Exchange Act is to be applied. Appellants say that all registered shares must be considered, including shares reserved for the exercise of options and for the exercise of conversion rights by preferred stockholders, which had been listed subject to notice of issuance; on that view the "class" would consist of 1,190,036 Jacobs shares. The government contends that only issued shares should be counted, or 882,607 for December, 1957–July, 1958, and 963,107 for November, 1958–January, 1959. In support of this it relies on SEC Rules X–16A–1 and X–16A–2. Rule X–16A–1 provides that "None of the reports provided for in § 16(a) need be made except as provided in this rule." Rule X–16A–2, entitled "Ownership of More Than 10 Percent of an Equity Security" provides, so far as material,

"In determining, for the purpose of rule X–16A–1, whether a person is the beneficial owner, directly or indirectly, of more than 10 percent of any class of any listed equity security, such class shall be deemed to consist of the amount of such class which has been issued, regardless of whether any part of such amount is not listed or registered or is held by or for the account of the issuer;"

■ Section 23(a), 15 U.S.C.A. § 78w(a), empowers the Commission "to

---

3. One is reminded of Judge Frank's remark as to the "unrealistic assumption that the incomprehensible words, uttered in the physical presence of the jurors, have some real effect on their thought processes." Courts on Trial, p. 117.

make such rules and regulations as may be necessary for the execution of the functions" vested in it, but this, of course, would not permit the Commission to require an insider's report in cases beyond the statute's reach. Appellants claim this is what the SEC has done by Rule X–16A–2, since they read § 16(a) to mean 10% of the registered securities of any class, which, they say, would include securities listed subject to notice of issuance. We disagree with this reading. The phrase "which is registered on a national securities exchange" defines the type of equity security in respect of which insider reports are required, as is plain from the provision in the next clause requiring these reports of a person "who is a director or an officer of the issuer of such security." The question here is what shares are included in the phrase "any class of any equity security." It is hardly to be thought that the shares to which the 10% beneficial ownership test was to be applied should include shares which could not yet be beneficially owned since they had not been issued. Many corporations have registered and listed common shares for the conversion of debentures or preferred stock or the exercise of options, subject to notice of issuance, in amounts approximating the issued shares; appellants' construction would mean that persons could acquire well over 10% of the outstanding common stock of such a corporation without complying with the reporting requirements of § 16(a) and without liability under the short-swing provisions of § 16(b). We hold that, in making issued shares the quantum to which the 10% test is to be applied, the SEC acted consistently with the language and purpose of Congress.

The government had difficulty in determining the precise number of Jacobs' shares owned by Comficor during the months for which violations were charged. Controversy rages over two exhibits in which the government summarized its version of the evidence as to the amount of Jacobs' stock held by Com-ficor during the critical months. The first exhibit, constructed from evidence as to purchases and sales by brokers, showed that Comficor had more than the required 10% in each month. The second exhibit sought to support the first by summarizing evidence as to how much Jacobs' stock was held for Comficor at the end of each month by pledgees and brokers who had not been paid; this met the 10% test except for December, 1958 and January, 1959, when liquidation by the lenders had begun. Appellants criticize the exhibits as including stock that was not Comficor's but belonged to Guterma or others. On the other hand, Lipton testified that Comficor's purchases and sales of Jacobs' stock were entered on its books in a separate account, that the purchase price for the Jacobs shares acquired by Comficor came out of its funds, that a separate account would have been needed if Comficor had bought shares as agent for others, and that there was no such account. The testimony created an issue of fact and the only criticisms of the court's charge on the Comficor counts were sufficiently met. Appellants say the task of weighing the evidence with respect to these complex financial transactions for each of eleven months was beyond the jury's capacity and that the jury perforce gave undue attention to the government's summary exhibits rather than the testimony that underlay them. However, we find nothing misleading in the exhibits; and it was open to defendants to prepare counter-exhibits embodying their version of the evidence, as they did in connection with Count 9. If defendants chose to avail themselves of their constitutional right to a jury trial, they must take its frailties along with its strengths.

*Count 9, Guterma and Eveleigh, Jacobs Form 8–K Report, January, 1959:* Section 13(a) of the Securities Exchange Act requires every issuer of a security registered on a national securities exchange to file "in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate for the proper protection of investors

and to insure fair dealing in the security —(1) Such information and documents as the Commission may require to keep reasonably current the information and documents filed pursuant to section 12," the latter containing the registration requirements for securities. Rule X–13A–11 requires every registrant to "file a current report on Form 8–K within ten days after the close of any month during which any of the events specified in that form occurs * * *" Item 2 of the form requires information "if the registrant or any of its majority-owned subsidiaries has acquired or disposed of a significant amount of assets, otherwise than in the ordinary course of business * * *" Instruction 4 defines "a significant amount of assets"; we quote this in the margin.[4]

The transaction claimed to have required the filing of a Form 8–K report by Jacobs for January 1959 was the pledge of all the capital stock and later of $763,000 of bonds and debentures and a promissory note of $2,630,000 of Grand Rapids Metalcraft Corporation, a wholly owned subsidiary, to Inland Credit Corporation, as security for a loan of $150,000. Prior to the Inland Credit loan Jacobs had pledged three promissory notes of Grand Rapids totaling $2,630,000 to James Talcott & Co. along with other collateral as security for certain loans. On January 6, 1959, Jacobs borrowed $150,000 from Inland Credit and pledged as security 34,578½ shares of the stock of Grand Rapids, these being all the issued and outstanding shares. On January 13 Jacobs delivered to Inland Credit additional collateral, to wit, "certain bonds and debentures issued by Grand Rapids Metalcraft Corporation, under its present or prior names, in the aggregate amount of approximately $763,000, and also a demand promissory note of even date made to our or-

der by said Grand Rapids Metalcraft Corporation in the principal sum of $2,630,000 and endorsed by us." Jacobs represented and warranted that it was the sole owner "of all of the said bonds and debentures and that the same are not subject to any claim or lien and that the indebtedness evidenced by the said promissory note is due and owing and has not been assigned, transferred, pledged or paid either in whole or in part."

Appellants' first claim was that the plege of the $2,630,000 note to Inland was not a disposition of an asset or, at least, not a disposition of the full amount of the note, since the note had already been pledged to Talcott. This was supported by testimony of a Talcott employee that the Talcott loans were not refinanced until February 5, 1959, the date also shown in the financial statements reported, with suitable qualifications, by Ernst & Ernst in November, 1959. Against this the government contended that the warranty made by Jacobs, along with the change in reference from three notes aggregating $2,630,000 to a single note of that amount, showed that the three notes must have been returned by Talcott prior to January 13. Although the most plausible solution of the puzzle may be that Jacobs had Grand Rapids execute a new $2,630,000 note on January 13 in anticipation of the early refinancing of the Talcott loan, the charge fairly put the conflicting evidence to the jury, and the judge was justified in declining to give the further charge that Guterma asked. In any event the issue becomes moot in view of our reversal of the conviction on this count on another ground.

In order to apply the SEC instruction quoted in footnote 4, it is necessary to know "the net book value" of the assets disposed of, the numerator of the frac-

4. "4. An acquisition or disposition shall be deemed to involve a significant amount of assets (i) if the net book value of such assets or the amount paid or received therefor upon such acquisition or disposition exceeded 15 percent of the total assets of the registrant and its con-solidated subsidiaries, or (ii) if it involved the acquisition or disposition of a business whose gross revenues for its last fiscal year exceeded 15 percent of the aggregate gross revenues of the registrant and its consolidated subsidiaries for the registrant's last fiscal year."

tion, and "the total assets of the registrant and its consolidated subsidiaries," the denominator. The government produced two exhibits with respect to the denominator, one showing the total assets of Jacobs and its consolidated subsidiaries on January 31, 1959 to be $16,147,197 and the other showing these assets to be $17,044,881 as of the same date. Defendants offered an exhibit showing the total assets to be $17,940,502. All these exhibits seem to have been prepared on the basis of including as assets both the parent company's claims against and stock interest in consolidated subsidiaries and the total assets of the subsidiaries themselves, since the audited statements of Jacobs and its consolidated subsidiaries showed assets of only $6,110,533 as of July 31, 1958 and $5,916,207 as of July 31, 1959. While this method of computation produces a totally unrealistic figure, leading, for example, to the seemingly absurd result that a holding company with 25% of its assets in the form of claims against or stock interests in four newly organized consolidated subsidiaries could dispose of any one without having to file a Form 8–K report, at least it squares with the literal words of the instruction, and, by inflating the denominator, is the construction most favorable to appellants. As to the numerator, the financial reports of Grand Rapids as of January 31, 1959 showed assets of $3,460,788 and liabilities other than stockholders "equity" of $4,874,891, these liabilities including the $2,630,000 of notes and additional long term debt of $763,175 due to Jacobs. The government claimed that the "net book value" of the pledged assets was $2,933,030, more than 15% even on defendants' figure of total assets; apparently this was the sum of two accounts on Jacobs' books, one entitled "notes Receivable," containing a balance of $2,630,000, and another entitled "Investment in Bonds of GRMC," having a balance of $303,030. The government supports this on the view that the numerator and the denominator of the fraction must be determined on a consistent basis.

It says that if assets are used without regard to liabilities in computing the denominator, the numerator must be similarly computed, with a deduction of only such reserves, e. g., for depreciation, as would normally appear on the asset side of the balance sheet, and there would be none such with respect to securities. On the other hand, defendants presented a figure of the "net book value" of the pledged collateral as $1,985,607; this was obtained by taking the balances in the same two accounts listed above, then adding two other accounts entitled "Investment Grand Rapids Metalcraft" and "Investment-GRMC" with respective balances of $1,000 and $1,440,217, the latter evidently representing the investment in the stock, and finally deducting the balance, $2,388,640, in an account entitled "Reserve for Operating Losses of Grand Rapids Metalcraft Corporation." Defendants say deduction of the reserve was appropriate in determining the "net book value" of the Grand Rapids securities held by Jacobs. The government itself had introduced exhibits showing the book value of the pledge of the Grand Rapids securities as $1,979,072, a figure quite obviously obtained by deducting the current liabilities of Grand Rapids from its assets as of January 31, 1959, treating the parent company debt as stockholders investment, and disregarding the investment in the stock.

After outlining most of this evidence the trial judge left it to the jury "as the ultimate triers of the facts in this case, to determine what weight, if any, you wish to place on the computations of Mr. Locke and Mr. Doyle [the government's witnesses] on the one hand, and those of Mr. Acker [the defendants' witness] on the other," and thereby determine "whether or not the net book value of the assets pledged constitutes more or less than 15 percent of the total assets of Jacobs and its consolidated subsidiaries." In doing this the judge gave the jury a task properly his own, namely, the interpretation of the term "net book value" in SEC Instruc-

tion 4 as applied to a pledge of securities. The conviction on Count 9 must therefore be reversed in any event; however, we think the court should have dismissed this count for failure of proof, at least on the interpretation of "total assets of the registrant and its consolidated subsidiaries" which the government's exhibits themselves adopted. Taking the lowest figure for such assets in any of the exhibits, the government was required to show that the "net book value" of the pledged collateral was some $2,422,000. It is arguable that use of the term "net" negatives reliance on gross figures even as to securities, at least where the facts suggest the gross carrying value of these to be inflated as they do here. To be sure, the figures resulting from applying the book reserve against Jacobs' investment or from treating Grand Rapids' obligations to Jacobs as if they were stock may be criticized as failing to reflect Jacob's creditor position, although the force of any such criticism is considerably blunted when we learn from the audited financial statements that on February 5, 1959, Jacobs made a capital contribution of $2,190,459 to Grand Rapids "through cancellation of certain of its notes receivable" and that subsequent to October 15, 1959, the debt of Grand Rapids to Jacobs was subordinated to obligations incurred by Grand Rapids in the ordinary course of business. If defendants were justified in believing that the instruction required something other than a gross figure even for securities on facts such as were here presented, and we cannot say they were not, the government failed to substantiate a net figure meeting the 15% test. There was thus no basis for a finding that the violation of the 8–K reporting requirement, if any there were, was knowing and willful; we therefore do not reach the question whether the SEC's instructions are sufficiently intelligible to support a criminal conviction as a matter of due process.

■■■ (4) Relying on United States v. Universal CIT Credit Corp., 1952, 344 U.S. 218, 73 S.Ct. 227, 97 L.Ed. 260, Guterma contends it was error for the court to impose separate fines on each substantive count since, as he alleges, the government's case was that the offenses sprang from a single impulse. On no view could CIT be reasonably claimed to prohibit separate punishment for the violations of § 16(a) involved in Counts 1 and 10–20, on the one hand, and for the violation of § 13(a) involved in Count 5, on the other. We deem it almost as clear that CIT does not preclude separate punishment for Guterma's failure to file a Form 4 report required of him as an officer and director, and his causing Comficor to fail to do so. The issue thus narrows itself down to whether CIT forbids separate fines on each of the 10 Comficor counts. We think not. Section 32(a) provides that "Any person who willfully violates any provision of this title, or any rule or regulation thereunder the violation of which is made unlawful or the observance of which is required under the terms of this title" shall upon conviction be fined not more than $10,000. or imprisoned not more than 2 years or both. Section 16(a) requires the filing of reports "within ten days after the close of each calendar month * * *, if there has been any change in such ownership during such month." To hold that each willful default in filing a monthly report is a separate offense is consistent both with the language of the statute and with the important purpose of achieving the timely filing of current information which Congress considered necessary for the protection of investors. There is no such legislative history here as the Supreme Court found so persuasive with respect to the Fair Labor Standards Act in CIT; furthermore changes in beneficial ownership are more discrete and independent than the normal situation with respect to employment at too low wages or too long hours. To such extent as precedents are helpful we find the instant case more analogous to Ebeling v. Morgan, 1915, 237 U.S. 625, 35 S.Ct. 710, 59 L.Ed. 1151; Badders v. United States, 1916, 240 U.S. 391, 36

S.Ct. 367, 60 L.Ed. 706, and Blockburger v. United States, 1932, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306, see Palmer v. United States, 10 Cir., 1955, 229 F.2d 861, certiorari denied 1956, 350 U.S. 996, 76 S.Ct. 546, 100 L.Ed. 861, all upholding separate punishment, than to CIT.

(5) Other objections raised by appellants can be briefly treated. There is no substance in the complaint that publicity prevented appellants from receiving a fair trial. Whatever force such a contention might or might not have had if appellants had been tried in the spring of 1959, see Delaney v. United States, 1 Cir., 1952, 199 F.2d 107, 39 A.L.R.2d 1300, the publicity had almost ceased by December 7, 1959, when the trial began, the only articles in the New York newspapers during the fall having been one in the World-Telegram on September 7 and two on the financial page of the Journal-American in September and October. Thirty-seven of forty-three veniremen testified they had never heard of any of the defendants and none of the other six sat on the jury. We cannot accept Guterma's claim that his case was so notorious that the veniremen must have been lying; it is a natural failing to believe the public are far more interested in one than they are and Guterma's argument would have more plausibility if the charge against him had been rape or murder, see Coppedge v. United States, 1959, 106 U.S.App.D.C. 275, 272 F.2d 504, 508, than the violation of requirements about which few jurors have ever heard or even the looting of a company relatively unknown.

There was no error in the Court's charge as to the meaning of "willful" as used in § 32(a), see Herlands, Criminal Aspects of the Securities Exchange Act of 1934, 21 Va.L.Rev. 139, 143-50 (1934). We have examined defendants' arguments as to the government's failure to produce documents in accordance with a pretrial order; we find either that the documents in question were outside the scope of the order or that defendants were not prejudiced in view of the adjournments given by the trial judge and his clear indication of willingness to grant longer ones if these were requested.

Finally we find no merit in Guterma's contention that the court contributed to his decision not to testify by declining to give an advance ruling limiting the extent to which he could be cross-examined on subjects involved in three other indictments, and that this was error. We are not aware of any requirement for such a ruling and Guterma had no reason to suppose objections to cross-examination would not be dealt with properly if he chose to take the stand.

The judgment of conviction is affirmed save as to Counts 2 and 9; the judgment is reversed as to Count 2 and the judgment is reversed and the indictment dismissed as to Count 9.