**UNITED STATES of America**

v.

**Louis WOLFSON and Elkin Gerbert,
Defendants.**

No. 66 Cr. 720.

United States District Court
S. D. New York.

May 18, 1967.

622

Robert M. Morgenthau, U. S. Atty., Southern Dist. of New York, New York City, for United States; Michael F. Armstrong and Paul B. Galvani, Asst. U. S. Attys., of counsel.

Shea, Gallop, Climenko & Gould, New York City, for defendant Wolfson and co-counsel for defendant Gerbert.

Arnold & Porter, Washington, D. C., co-counsel for defendant Gerbert.

PALMIERI, District Judge.

The defendants are charged in nineteen counts with violating and conspiring to violate the registration provisions of the Securities Act of 1933 (15 U.S.C. § 77e(a)) with respect to the allegedly illegal distribution to the public of common stock in the Continental Enterprises, Inc. (Continental).

They move for various forms of relief, several of which are dealt with here at the outset inasmuch as they are, in effect, repetitive of motions made with respect to another indictment—66 Cr. 832.

This indictment was filed by the same Grand Jury against these defendants, as well as others, and will be referred to for convenience as the Merritt-Chapman case.

■ These repetitive motions seek to dismiss the indictment on two separate grounds: first, that the Grand Jury which handed down the indictment was selected in violation of the Fifth Amendment and 28 U.S.C. §§ 1861, 1862, 1863, 1864 and 1865;[1] and second, that the defendants' Constitutional rights were violated by allegedly improper conduct of the United States Attorney before the Grand Jury. The allegedly improper conduct relates to the calling of a possible defendant to testify before a Grand Jury investigating his activities, after being advised that the prospective witness would assert his Fifth Amendment privileges; and the management of such a witness' questioning before the Grand Jury as well as the availability of his legal counsel during such questioning. The basic facts relating to the motions in both cases are the same. The Grand Jury, the Grand Jury minutes, and the defendants[2] are identical with respect to the motions in both the Continental and the Merritt-Chapman cases. Under date of April 4, 1967, Judge Cooper of this Court filed an extensive opinion denying the relief requested on both grounds. Similar contentions have been made by other defendants in two recent cases with respect to similar alleged improper conduct of the United States Attorney and have been ruled on adversely to the defendants by Judge Tenney of this

Court (United States v. Leighton, et ano., 265 F.Supp. 27, Jan. 23, 1967) and by Judge Weinfeld of this Court (United States v. Pilnick, et al., 267 F.Supp. 791, April 25, 1967). There is no valid reason for any departure by this Court from the views expressed by the three Judges approving the conduct of the United States Attorney in each instance. Accordingly, the motions are denied for the reasons set forth in their respective opinions.

■ The defendants additionally have moved, concededly *pro forma*, for a list of the witnesses expected to be called by the Government at the trial. This relief has been previously denied by this Court in a non-capital case and is denied here for the reasons set forth in United States v. Manhattan Brush Co., 38 F.R.D. 4 (S.D.N.Y.1965).

The remaining motions seek (1) transfer of the trial to the Middle District of Florida, (2) dismissal of the substantive counts, and (3) dismissal of the indictment. These will be discussed seriatim.

### The Motion to Transfer

■ This motion is made pursuant to the provisions of Rule 21(b), Fed.R. Crim.P.[3] A previous motion to transfer based upon Rule 21(a), Fed.R.Crim.P.,[4] was denied by Judge Tyler of this Court on December 13, 1966. In essence, the defendants claim that since the defendants live in Jacksonville, Florida, and since the corporate records of Continental are in Jacksonville, the trial should be transferred to Florida. Addi-

---

1. These sections concern the qualifications of Federal jurors; exemptions, exclusions, and excuses from jury service; manner of drawing names of jurors; jury commissioners and their compensation; apportionment within districts; and additional jury commissioners.

2. Two additional defendants also moved in the Merritt-Chapman case.

3. "Transfer in Other Cases. For the convenience of parties and witnesses, and in the interest of justice, the court upon motion of the defendant may transfer the

proceeding as to him or any one or more of the counts thereof to another district."

4. "For Prejudice in the District. The court upon motion of the defendant shall transfer the proceeding as to him to another district whether or not such district is specified in the defendant's motion if the court is satisfied that there exists in the district where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district."

tionally, personal reasons of health and convenience are advanced. It is also contended that prospective defense witnesses will come from Florida and can appear more readily and testify more effectively if the transfer were allowed. The defendants also urge that a review of their motion previously denied by Judge Tylor may impel a different result when considered along with the factors asserted in support of the motion now made pursuant to Rule 21(b), Fed.R.Crim.P. The relief requested must be denied because none of the factors, whether considered singly or collectively, would justify transfer of the trial. This motion is concededly addressed to the Court's discretion. Platt v. Minnesota Mining Co., 376 U.S. 240, 245, 84 S.Ct. 769, 11 L.Ed. 2d 674 (1964), and must be sufficiently persuasive to override the general rule that a criminal prosecution should be retained in the original district. United States v. United States Steel Corp., 233 F.Supp. 154 (S.D.N.Y.1964). The venue here is correct and is based upon substantial financial transactions which took place in this district. The defendants are persons of substantial means to whom questions of travel and transportation should not present serious difficulties. Moreover, the trial court has sufficient power and latitude in the management of the trial to take account of matters which seriously affect the convenience of parties or witnesses. Additionally, extensive and rapid facilities for travel between New York and Florida are available. Indeed, the defendants are directors of the Merritt-Chapman & Scott Corporation which has its main offices in New York.

Finally, the matter of timeliness deserves mention. Rule 22, Fed.R.Crim.P., provides:

> A motion to transfer under these rules may be made at or before arraignment or at such other time as the court or these rules may prescribe.

Substantially all of the grounds asserted as the basis for this motion could have been put forward when the prior motion before Judge Tyler was argued in November, 1966. This indictment was filed on September 19, 1966, and the related Grand Jury proceedings to which defendants were subpoenaed took place in August and September, 1966. While the motion is denied on the merits and not for lack of timeliness, this Court feels constrained to point out that the renewed and revamped motion for transfer is made about seven months after the indictment, and on the eve of trial.

### The Motion to Dismiss the Substantive Counts

The substantive counts of the indictment, Counts 2 through 19, allege mailings of confirmations of sales of securities to the defendant or his agent. Counts 2 through 11 and 17 through 19 each alleges the mailing of a confirmation of sale from the New York broker who executed the sale to the defendant Wolfson. Counts 12 through 16 allege the mailings of similar confirmations to James Mullaney of Jacksonville, Florida, presumably a person whose agency relationship will be established at trial. These allegations have been amplified by a bill of particulars.

The "use * * * of the mails to sell [unregistered stock] through the use or medium of any prospectus *or otherwise,*" (emphasis supplied) is forbidden by 15 U.S.C. § 77e(a) (1). Anyone who causes such a "use" is responsible for it under 18 U.S.C. § 2.

The defendants suggest that the confirmations alleged are not within the purview of the statutory prohibition because they constituted mailings to a seller allegedly after consummation of the sale. Mailings of confirmations to purchasers are within the purview of the statute, United States v. Greenberg, 30 F.R.D. 164 (S.D.N.Y.1962). The defendants, while conceding that a confirmation sent to a purchaser "might be a mailing offensive to the policy of the Securities Act of 1933", argue that "a confirmation sent to the seller by his own broker does not conflict with the thrust of the Act in the slightest."

The distinction is not validly drawn. There is nothing in the Act to suggest

that its thrust is confined to elements of disclosure by a seller to a purchaser; and the defendants have cited no case to support their position. In United States v. Hughes, 195 F.Supp. 795 (S.D.N.Y.1961), it was expressly held that the statutory language above quoted was by its terms —"prospectus or otherwise"—sufficiently broad to include confirmations of purchases as appropriate allegations for substantive counts under 15 U.S.C. § 77e(a) (1). Rules 15(c) (1) through (4) under the Securities Exchange Act of 1934, requiring a broker to send a confirmation to the seller at the time of the sale, make the sending of such a confirmation an essential step in the process of sale. The confirmation to the purchaser and the confirmation to the seller are opposite sides of the same coin, each brought about by the seller's order with the broker; one advising the buyer of the requirement for payment, the other advising the seller of the correlative requirement for surrender of the stock.

If general guidance in this area were needed it can be found in the language of the opinion in Schillner v. H. Vaughan Clarke & Co., 134 F.2d 875, 878 (2d Cir. 1943): "In declaring unlawful the transactions described in Section 5 Congress meant to exert its power to the full constitutional extent permitted by the commerce clause and the postal clause." (footnote omitted).

■ The conclusion is inescapable that the statute proscribes any mailing or use of interstate commerce made for the purpose of effecting the sale, transfer or delivery of unregistered stock.

The Motion to Dismiss the Indictment on the Grounds of (a) Alleged Unconstitutional Vagueness in the Concept of Control in the Securities Act and (b) Alleged Exemptions under the Securities Act of 1933

These are elaborate motions in which the defendants seek to demonstrate that the concept of "control" under the Securities Act of 1933 is vague and indefinite in violation of the Fifth Amend-

ment to the United States Constitution; and, further, that they are exempt from the registration provisions of the Securities Act.

■ Both branches of this motion are made in some measure upon assumptions of what the Government's proof will be at trial. They are to that extent premature and present questions that can appropriately be decided only by the trial court.

The "control" concept under the Securities Act of 1933 is not defined by the statute. But it was expressly passed upon in United States v. Re, 336 F.2d 306, 316 (2d Cir.), cert. denied, 379 U.S. 904, 85 S.Ct. 188, 13 L.Ed.2d 177 (1964), where the Court stated that the meaning of "control" is no different under the Act from what it is in normal everyday usage and that the "requirement of reasonable certainty does not preclude the use of ordinary terms to express ideas which find adequate interpretation in common usage and understanding" citing Sproles v. Binford, 286 U.S. 374, 393, 52 S.Ct. 581, 583, 76 L.Ed. 1167 (1932); cf. United States v. Guterma, 281 F.2d 742, 746–747 (2d Cir.), cert. denied, 364 U.S. 871, 81 S.Ct. 114, 5 L.Ed.2d 93 (1960); United States v. Minuse, 142 F.2d 388 (2d Cir.), cert. denied, 323 U.S. 716, 65 S.Ct. 43, 89 L.Ed. 576 (1944).

■ The legitimate interests of the defendants with respect to whether or not they were persons in control can be properly served by a fair submission of the issues to the jury. The possible problems raised by the concept of control can neither be anticipated nor ruled upon in the present posture of the case.

■ The second branch of this motion rests on the defendants' contention that the transactions charged as violative of the 1933 Act cannot be so classified because the securities involved did not require registration and are expressly exempt from registration. The requirement for registration is provided for in Section 5(a) of the 1933 Act, 15 U.S.C.

§ 77e(a).[5] The express exemptions relied upon are set forth in Section 4 of the 1933 Act, 15 U.S.C. § 77d.[6] In essence, the defendants urge that these statutory provisions by their meaning and in accordance with administrative rulings adopted by the Securities and Exchange Commission as late as May 1946, allowed a controlling stockholder to sell his securities through a broker without registration.

No relevant legal authority has been cited by defendants in support of this argument nor has any been found.

Any extended discussion of defendants' argument is hardly justified since it leads to the curious and anomolous result that a massive distribution of unregistered control stock as here alleged[7] can be effected through a broker without the risk of statutory sanctions. Such a result is not consonant with the meaning or purposes of the Act. See 1, Loss, Securities Regulation (2d ed. 1961) pp. 700–706.

■■■ The Securities Act of 1933 sets forth a comprehensive plan to achieve its objective of protecting the investing public. One of the essential steps adopted in furtherance of this objective was the requirement for the filing of registration statements making a full and accurate disclosure of all material facts. Thus, the investing public was intended to have available to it reliable information upon which an appropriate judgment could be made with respect to any investments in the registered security. The broad and all-encompassing prohibition against the use of the mails or means of interstate commerce to sell unregistered securities must be read in conjunction with the claimed exemptions which are in the nature of exceptions to the overriding purposes of the Act. Securities and Exchange Com'n v. Guild Films Co., 279 F.2d 485, 489–490 (2d Cir. 1960). The statute

"does not affect the ordinary redistribution of securities unless such redistribution takes on the characteristics of a new offering by reason of the control of the issuer possessed by those responsible for the offering. It carefully exempts from its application certain types of securities and securities transactions where there is no practical need for its application or where the public benefits are too remote." H.R.Rep. No. 85, 73rd Cong., 2d Sess. 5 (1934).

Here where sales of large quantities of securities were allegedly made generally to the public, the benefits of this remedial statute should not be thrust aside. The "terms of * * * an exception * * * must be 'strictly construed' against the claimant of its benefit". Securities and Exchange Com'n v. Sunbeam Gold M. Co., 95 F.2d 699, 701 (9th Cir. 1938); cf. Securities and Exchange Com'n v. Ralston Purina Co., 346 U.S. 119, 126, 73 S.Ct. 981, 97 L.Ed. 1494 (1953); Edwards v. United States, 312 U.S. 473, 61 S.Ct. 669, 85 L.Ed. 957 (1941); Se-

5. This section provides that:
 Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—
   (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or
   (2) to carry or cause to be carried through the mails or in interstate commerce, by any means of instruments of transportation, any such security for the purpose of sale or for delivery after sale.

6. They provide as follows:
   (1) transactions by any person other than an issuer, underwriter, or dealer.
     *       *       *       *       *
   (4) brokers' transactions, executed upon customers' orders on any exchange or in the over-the-counter market but not the solicitation of such orders.

7. The indictment charges that the defendants would sell approximately 460,000 shares and their co-conspirators 230,000 shares of the Continental common stock. The Government asserts that there were 2,510,000 shares of Continental issued and outstanding.

curities and Exchange Com'n v. Culpepper, 270 F.2d 241, 246 (2d Cir. 1959).

Moreover, these exemptions cannot be understood with reference to any particular person's general business but on the basis of his relationship to a particular transaction. The individuals who take part in the transaction are exempt only insofar as the transaction is exempt.

Depending upon the evidence adduced at the trial the defendants may be found to be controlling persons who used underwriters to distribute stock to the public, or to be themselves underwriters. See United States v. Crosby, 294 F.2d 928, 939–940 (2d Cir. 1961), cert. denied, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962). Whether this can be established is not now predictable and depends, of course, upon the outcome of the trial. The jury will be obliged to consider the evidence under appropriate instructions. It will be their ultimate responsibility to determine whether the shares in question were required to be registered and whether the transactions were exempt. The Court cannot now make a ruling eliminating these crucial questions from jury consideration.

Motions denied. It is so ordered.