**UNITED STATES of America,**

v.

**Nicholas A. RUDI, Defendant.**

**No. 95 Cr. 166 (LLS).**

United States District Court,
S.D. New York.

June 6, 1996.

United States Attorney, Southern District of New York, New York City, for the U.S. and (Michael E. Horowitz and Karen Patten Seymour, of counsel).

Thomas P. Puccio, New York City, for defendant.

## OPINION AND ORDER

STANTON, District Judge.

In this criminal case defendant Nicholas Rudi, a former financial consultant in New Jersey to the Camden County Municipal Utilities Authority ("CCMUA"), was charged with obtaining a kickback from First Fidelity, N.A., a lead underwriter on a public offering of CCMUA bonds in 1990 (the "Bond Issue"). At the close of the government's case, he moves for dismissal of count five of the indictment. Both sides agree there is no legal authority directly in point.

From the evidence one could conclude that First Fidelity surreptitiously paid Rudi the difference between the much larger fee he had received in the past for his work on CCMUA bond issues—one dollar per $1000 face amount issued (or "a buck a bond")— and the $15,000 he was entitled to receive from the CCMUA under a new and different fee arrangement made in 1989.

First Fidelity paid to Rudi, through intermediaries, over $200,000 under the kickback arrangement. Count five has nothing to do with that payment.

After the 1990 Bond Issue had closed, the First Fidelity officer who had made the earlier payment mistakenly thought that Rudi was owed an additional $22,000 under the kickback agreement. To justify that, about two months after the closing Rudi sent First Fidelity a false invoice (the "Invoice"), purportedly for work connected with an entirely unrelated bond issue in which he had not participated, and First Fidelity paid him the additional $22,000. Thus, First Fidelity's records regarding that payment misrepresented its nature and purpose.

Count five of the indictment charges Rudi with aiding and abetting First Fidelity's violation of section 15B(c)(1) of the Exchange Act of 1934 with respect to the $22,000 payment.

Section 15B(c)(1) provides:

No broker, dealer, or municipal securities dealer shall make use of the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any municipal security in contravention of any rule of the [Municipal Securities Rulemaking] Board.

15 U.S.C. § 78o –4(c)(1).

Thus, the issue is whether the misrecording of that payment is criminally chargeable because the Bond Issue transaction, which was effected or induced by use of the mails, contravened a rule of the Municipal Securities Rulemaking Board ("MSRB"). Its Rule G–8, referred to in count five, requires every broker, dealer and municipal securities dealer to make and keep clear and accurate records of all receipts and disbursements of cash with respect to transactions in municipal securities, and reconciliations of profits and expenses of syndicate transactions. Rule G–8(a)(i) and (b), MSRB Manual (CCH) 3651, 3653 (March 1996).

In short, the charge is that because the records concerning the $22,000 payment violate the MSRB rules, the Bond Issue was effected in violation of the statute.

The government makes the plausible argument that bond transactions like the one at issue here are routinely followed by post-closing balancing payments, adjustments of accounts and financial statements, whose accuracy is so germane to the transaction itself that if the records are false the whole transaction is tainted, the statute is invoked, and a crime committed. It also argues, less plausibly, that no functional connection with the transaction need be shown, as long as the records were inaccurate. It is hard to see where that approach would stop short of making every erroneous record a felony, unless some reasonable proximity to the transaction itself is required.

Here, the $22,000 payment was no more than an afterthought, only accidentally a part even of the fraudulent scheme. To say it brought the whole Bond Issue into violation of the rules puts things backwards. The Bond Issue itself was neither effected nor induced in contravention of the rules regarding recordkeeping with respect to the $22,000 payment. The $22,000 payment records are too remote and peripheral to justify holding that the Bond Issue contravened the MSRB's rules. Although such arguments may be given scope in civil proceedings under the securities laws, the proximity must be more rigorously examined in criminal cases.

*United States v. Wolfson,* 269 F.Supp. 621 (S.D.N.Y.1967), cited by the government, illustrates the other side of the issue. There jurisdiction rested on confirmations, sent to the parties, reflecting the very purchases and sales of the securities. They formed an integral part of and were necessary to the transactions themselves. *See id.* at 624–25.

The point is not whether it was before or after the closing that the false Invoice was sent or the record entry made, but that their relationship to the Bond Issue transaction is not close enough to support criminal liability under section 15B(c)(1).

Accordingly, count five of the indictment is dismissed.