**UNITED STATES of America, Appellee,**

v.

**Joseph ABRAMS, Sydney L. Albert, and Richland Securities, Inc., Defendants-Appellants,**

**David Schindler, Larry Knohl, Charles Gordon, Defendants.**

No. 98, Docket 29297.

United States Court of Appeals Second Circuit.

Argued Dec. 7, 1965.

Decided March 4, 1966.

------♦------

Michael F. Armstrong, Asst. U. S. Atty., New York City (Robert M. Morgenthau, U. S. Atty. for Southern Dist. of New York, David M. Dorsen, Neal J. Hurwitz, and John E. Sprizzo, Asst. U. S. Attys., New York City, on the brief), for appellee.

Samuel Gottlieb, New York City (Louis A. Tepper and O. John Rogge, Gainsburg, Gottlieb, Levitan & Cole, New York City, on the brief), for defendants-appellants.

Harry K. Nadell, New York City, for defendant-appellant Sydney L. Albert.

Before LUMBARD, Chief Judge, and SMITH and HAYS, Circuit Judges.

LUMBARD, Chief Judge:

Joseph Abrams, Sydney L. Albert and Richland Securities, Inc. appeal from their convictions by a jury in the Southern District of New York on numerous counts of an indictment charging use of the mails and other means and instruments of interstate commerce in selling to the public, during middle and late 1956, stock of the Automatic Washer Company for which no registration statement had been filed with the Securities and Exchange Commission, as required by law, and for conspiracy to violate the registration provisions of the Securities Act. 15 U.S.C. §§ 77e(a), 77x and 18 U.S.C. § 371. Abrams was sentenced to five years imprisonment, Albert was sentenced to three years imprisonment, and Richland was fined $5,000.[1] Appellants claim that numerous errors requiring reversal of their convictions were committed during their trial which lasted from September 4, 1963 to February 15, 1964.

Of the claims which we think merit discussion, seven were briefed and argued for Joseph Abrams and Richland Securities, and adopted by Sydney L. Albert, and the eighth was briefed and argued by Albert, as follows:

I. The Sufficiency of the Evidence

II. Alleged Errors in the Admission and Exclusion of Evidence

III. Alleged Errors in the Judge's Charge

IV. Whether Abrams Secured Immunity by Testifying Before an Examiner of the SEC

V. Whether Abrams should have been tried by the Court instead of by the Jury

VI. Whether Abrams had a right to participate in the hearing after trial on Albert's mental capacity

VII. Whether a new trial should have been granted because of allegedly newly discovered evidence

VIII. Whether Albert's right not to testify was violated by an opening statement made by Knohl's counsel; whether the court should have granted a mistrial.

---

1. Abrams and Richland were found guilty on counts 2, 11, 17 through 25, 55 through 57, 75, 79 and 104. Abrams was sentenced to a term of five years imprisonment on each count, the sentences to run concurrently. Richland was fined $5,000 to cover all counts. Albert was found guilty on counts 80 through 82, 86, 90 through 96, 99 through 103 and 104. Albert was sentenced to a term of three years on all counts to be served concurrently.

As we find ample evidence to support the convictions and no errors in the conduct of the trial, we affirm the convictions.

## I. THE SUFFICIENCY OF THE EVIDENCE

### The Indictment

The indictment, filed April 3, 1961, charged Abrams, Richland and Albert and co-defendants Larry Knohl, Charles Gordon and David Schindler with unlawful use, during various times in 1956, of means and instruments of communication in interstate commerce to sell the common stock of Automatic Washer Company, there not then being in effect with the SEC a registration statement as to said security. Knohl was tried with the appellants and acquitted by the jury, Schindler died prior to trial, and the charges against Gordon were severed and were later dismissed.

It was the government's contention that Abrams and Albert were "underwriters" of the Automatic stock, as that word is used in the statute, 15 U.S.C. § 77b(11), since they purchased from the issuer with a view to selling or distributing the stock. Therefore, being underwriters, they violated the statute by selling stock which was not registered,[2] and for which there existed no exemption from the registration requirements of the Securities Act of 1933.[3] Thus, it was relevant on the issue of intent, purpose and willfulness for the government to show the interest of Abrams and Albert in the Automatic Washer Company and its stock and the financial arrangements and agreements which preceded their disposition of the many thousands of shares of Automatic stock which they thereby acquired. We therefore summarize the record facts regarding:

### Acquisition of Automatic Stock by Abrams and Albert

In February 1955 Albert acquired control of Bellanca Aircraft Corporation, then a corporate shell, by purchasing 82% of its stock. Upon becoming president and a director, Albert exercised complete control of its affairs. On March 10, 1955 Albert, for Bellanca, contracted to acquire N. O. Nelson, then a profitable plumbing supply concern with headquarters in St. Louis, Missouri, and its subsidiary, Joplin Supply Co., for approximately $4,800,000. To accomplish this Albert borrowed $4,000,000 for Bellanca from the Mastan Company for a "fee" of $500,000 and repayment in 11 months, with 6% interest. As security Albert assigned Bellanca's Nelson and Joplin stock, 100,000 shares of Bellanca stock, and gave guarantees of various companies, his wife and himself, and a guarantee of $500,000 by Abrams, for which he also pledged Bellanca stock to Abrams. After making two monthly repayments to Mastan—one by Bellanca and one paid by himself, Albert refinanced the Mastan loan through a loan of $3,600,000 to Nelson and Joplin from the Walter E. Heller Company. For this new loan Nelson and Joplin pledged all their assets. The borrowed $3,600,000 was transferred to Bellanca on December 5, 1955 and on the following day the Mastan loan, now $3,212,950, was retired and Albert received the balance of $387,-050.

In late November 1955 Abrams had met John Chamberlin, president of Automatic, a washing machine company with its principal place of business in Newton, Iowa, which was then badly in need of financing. This led to discussions in early December as a result of which Albert agreed that his company, Pierce Governor Company, would buy 330,000 shares of Automatic original issue stock for $2.55 per share, which was 15% under the then market price. As there were only 292,594 shares then issued and outstanding this arrangement would give Albert control of Automatic.

---

**2.** 15 U.S.C. § 77e, which reads in part:
"(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, * * *
(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise * * *."

**3.** 15 U.S.C. §§ 77c, 77d, and 77e.

Abrams and Schindler provided the money by finding purchasers for Pierce stock and by buying 100,000 shares of Automatic in the name of Richland.

On December 10, 1955 Automatic purchased the assets of the Washer-Dryer Corporation which was located in a garage in Skokie, Illinois, for 228,000 shares of Automatic which it was to issue and these shares were distributed to the shareholders of Washer-Dryer. Three days later, on December 13, Abrams suggested to Chamberlin that Automatic should buy Nelson which he said had a net worth of about six and a half to seven million dollars. Abrams told him nothing about the $3,600,000 loan to Nelson and the mortgages of the Nelson and Joplin assets and accounts.

On December 22, Albert, Abrams and Chamberlin agreed that Automatic would issue to Bellanca 1,255,000 shares for Bellanca's ownership of 96.7% of Nelson's issued and outstanding stock. Albert arranged that of the Automatic shares to be issued to Bellanca, 305,000 shares would be issued to him personally in payment of a note for $1,525,000 which he caused Bellanca to make payable to himself. Albert then endorsed the note and delivered it to Chamberlin as the consideration for the 305,000 shares.[4]

To enable Bellanca to pay off the Mastan loan the parties arranged for Nelson to declare a $3,600,000 dividend payable to Bellanca on January 4. This required a revision of the December 22 agreement which had prohibited such a payment, but this was done about the middle of January by an agreement which was pre-dated to December 23. It was not until mid-January that Chamberlin first heard of the Heller loan. The result of all this was the depletion of Nelson's working capital.

On March 1 Bellanca issued a news release of its sale of Nelson to Automatic for 950,000 shares, the recent closing price of which had been 8⅛ on

the Midwest Exchange. Although the release stated that Bellanca had received dividends of $3,466,800 from Nelson, nothing was said either about the Heller loan and the resulting serious financial condition of Nelson and Automatic or the 305,000 shares issued to Albert.

On April 6, 1956 Automatic delivered to Albert 105,000 shares which, with the 200,000 already delivered to him about February 23, totalled the 305,000 shares in payment of the so-called note to him from Bellanca. Automatic also delivered 950,000 shares to Rothschild, treasurer of Bellanca, who then gave 50,000 shares to one Hayutin, acting as agent for Abrams, and turned over the remaining 900,000 shares to Albert. Earlier, on February 21, Abrams had received 50,000 shares of Automatic in return for what Abrams alleged to be $300,000 worth of rubber machinery which Abrams claimed to own but which he never turned over to Automatic.

Thus, by early April, Abrams and Schindler had acquired 210,000 shares of Automatic and Albert had or controlled 1,435,000 shares—through Pierce and Bellanca—a total of 1,645,000 out of the 2,155,594 shares then outstanding. Abrams himself in a letter written to Albert's attorney, Albert Kahn, on March 2, characterized these transactions: "[T]he N. O. Nelson deal for Automatic is the worst kind of robbery this side of heaven, insofar as the Automatic stockholders are concerned." And six days later he again wrote Kahn that "Automatic Washer is taking the most terrible beating that it could possible (sic) take in making the Nelson deal." These characterizations by Abrams could well have been found by the jury not to be overstatements of the truth.

### Abrams and Albert Dispose of Their Stock

The evidence showed that Abrams disposed of 56,300 shares. He sold 7,000

---

4. Bellanca never owed Albert any such amount. Abrams computed the total worth of 305,000 shares at $5.00 per share and drew up the note which Albert signed on behalf of Bellanca. After the stock was issued to Albert, Chamberlin returned the note to Bellanca on the instructions of Abrams.

shares for $21,000 to four or five friends in early 1956. Through accounts which he set up at H. Hentz & Co. for nine relatives and close friends, he sold 8,500 shares from April 30 to July 20, 1956. One of these, Gabriele Gurland, testified that she knew nothing about the account. From the testimony of the others in this group of nine the jury could well have concluded, as the government contended, that Abrams simply used their names without their knowledge and gave all the instructions to Robert Berk of Hentz & Co. Through the brokerage firm of Montor and Company, Abrams sold 40,800 shares in August, September and October 1956.

There was evidence that Albert distributed to the public 291,651 shares of Automatic which belonged to him or Bellanca by direct sales or by pledging the stock and causing it to be sold under such circumstances that the jury could find that the purpose was distribution to the public. The proof presented a question for the jury whether Albert had placed Automatic stock with five institutions, as collateral for the repayment of loans, with the legitimate intent to use the stock as collateral or whether so pledging it amounted to an indirect means of selling the stock as he never intended to repay the loans and knew that the stock would be sold upon his default. The jury found Albert guilty of sixteen such transactions in 1956, as follows:

| Count | | | | |
|---|---|---|---|---|
| 80 | Dreyfus & Co. | 100 shares | May 28 |
| 81 | " | 100 | May 29 |
| 82 | Francis I. duPont & Co. | 5,000 | June 11 |
| 86 | Harvard Trust Co. | 800 | Sept. 18 |
| 90 | " | 1,000 | Oct. 5 |
| 91 | " | 4,000 | Oct. 8 |
| 92 | Lewis & Stoehr | 15,000 | May 11 |
| 93 | " | 5,000 | May 21 |
| 94 | " | 400 | June 13 |
| 95 | " | 400 | June 13 |
| 96 | " | 200 | June 13 |
| 99 | " | 2,500 | June 13 |
| 100 | " | 500 | June 13 |
| 101 | Meadowbrook National Bank | 15,000 | June 14 |
| 102 | " | 10,000 | Aug. 1–10 |
| 103 | " | 5,000 | Sept. 6–14 |

The proof showed that in the transactions with the Meadowbrook National Bank, Albert dealt through Larry Knohl who arranged to have the loan made to Knohl's son-in-law, Samuel Bankin. Automatic stock which had been supplied by Albert was put up as collateral and later sold out to pay off the loan on Knohl's orders.

The testimony of Walter White, vice-president of Equitable Security Trust

Company of Wilmington, was striking evidence of the illegality of these pledge transactions. Albert told him that as he was a principal he could not sell Automatic stock as this was prohibited by the SEC but that he had no objection if Equitable sold the stock for him.

There was ample evidence from which the jury could find the four elements which Judge Tyler correctly instructed them they must find in order to

convict Abrams, Albert and Richland on the substantive counts. First, interstate facilities of communication had been used to sell the Automatic stock on the Midwest Exchange, and in some cases the mails had been used. Second, it was conceded that the stock had not been registered with the SEC. Third, there was evidence from which it could be found that Abrams and Albert were statutory underwriters and that consequently the stock was not exempt from registration. Fourth, there was abundant evidence of willfulness to violate the law, such as the misrepresentations to Chamberlin, Baradel and Masiello; the handling of the dummy accounts at Hentz & Co., Abrams' statements to Shiah Arsham about manipulating the price of Automatic stock [5] and the letters Abrams wrote to Kahn on March 2 and March 8, 1956, which we have referred to above.

## II. ERRORS IN THE ADMISSION AND EXCLUSION OF EVIDENCE

Appellants complain that much of the proof admitted over their objection went far beyond what was properly relevant to the narrow issue of illegally selling unregistered stock. We disagree.

■ It was relevant for the government to show that the failure to file a registration statement was motivated by the desire of Abrams and Albert to conceal their fraudulent activities. It was necessary to a proper understanding and decision of the charges to know how appellants acquired their Automatic stock and how they conducted the affairs of Bellanca, Automatic, Nelson, Joplin and other companies which they controlled. It was pertinent to show that these activities could not have withstood scrutiny by the SEC and that Abrams and Albert must have known that they could never have obtained registration of the Automatic stock by the SEC and therefore they had a motive for concealing their activities and the true condition of Auto-

matic. We have so held when the fraud itself is at issue in counts in the case. See United States v. Doyle, 2 Cir., 348 F.2d 715, 720 (1965); United States v. Guterma, 281 F.2d 742, 746, cert. denied, 364 U.S. 871, 81 S.Ct. 114, 5 L.Ed.2d 93 (1960); United States v. Houlihan, 332 F.2d 8, 14–15, cert. denied, 379 U.S. 828, 85 S.Ct. 56, 13 L.Ed.2d 37 (1964). It is no less relevant on motivation where the fraudulent activities, if revealed, would prevent SEC registration.

■ For the same reasons the letters of March 2 and March 8, 1956 from Abrams to Albert's attorney, which characterized the Nelson deal as "robbery" and as a "terrible beating," were clearly relevant on the question of intent and willfulness. Likewise, the testimony of Shiah Arsham that Abrams told him in late December or early January 1956 that he and Schindler would "control" and "manipulate" the Automatic stock was properly admitted.

■ ■ Appellants complain of the exclusion of certain evidence, in particular a report from the Midwest Stock Exchange, and the refusal of the trial judge to direct the government to turn over to counsel a deposition of one Louis Carmick, a Chicago attorney. The Midwest report was properly excluded because it was nothing more than a collection of hearsay statements, opinions and conclusions. Even on the assumption that the document might have been admitted as a business record, which theory to us seems highly doubtful, Abrams as the moving party had the burden of showing that the document qualified under 28 U.S.C. § 1732, the statutory business record exception. He never offered to do so and hence, the document was properly excluded.

As for the Carmick deposition, we find that the court did not commit error when it refused to direct the government to turn over this document to Abrams' attorney while Chamberlin was on the

5. Abrams told Arsham that he and Schindler would "control," "head up" and "manipulate" the market in Automatic stock and drive the price from 3 to 8 or 10.

stand. We find no authority for the proposition, advanced by Abrams, that hearsay statements by a third party may be introduced to impeach a witness. The court made it abundantly clear that if Abrams wished to obtain the document for any purpose, he could always obtain the document by serving a subpoena and using the document as best he could. In any event, Carmick was always available to be called as a witness and the defense chose not to call him. Thus, the deposition was properly excluded.

### III. ALLEGED ERRORS IN THE JUDGE'S CHARGE

■ ■ Abrams claims that counts 2, 11 and 17 through 21 of the indictment were barred by the five-year Statute of Limitations, 18 U.S.C. § 3282, and that it was error for the trial judge not to inform the jury that the "sales" from Abrams to Carusi and Gordon on March 14, 1956, were beyond the limit. We find that the jury was properly instructed that the government had to prove that the sales to the public occurred within the five-year period prior to April 3, 1961, the date of the indictment, and that Abrams could be found guilty only if he was responsible for the sales out of the nominee accounts, all of which occurred within the statutory period. There is ample evidence to support the jury's finding that the real sales to the public were made from the nominee accounts from April 24 through July 16, 1956 and hence, were within five years of the indictment.

Appellants also claim that the trial court committed reversible error when it charged that "if the defendants 'took the Automatic Washer stock with the intention at the time of taking it to sell to the public, the fact that such defendants later suffered a severe change in their personal circumstances before they actually sold it to the public is not relevant and will not keep them from being guilty as statutory underwriters.'" Appellants claim that, in effect, they were punished

for criminal intent, "notwithstanding that the act at the time of its execution was legal."

■ The Securities Act of 1933, 15 U.S.C. § 77b(11) defines an underwriter as one who takes from an issuer with a view toward distribution. Thus, if Abrams and Albert took stock from Automatic with an intent at the time of the taking subsequently to distribute the stock to the public, they could be considered to be underwriters.[6] If, in fact, they were underwriters, any transaction involving the stock so taken from Automatic could not qualify for exemption from registration under § 77d(1). And, distribution of stock which was not registered with the SEC was prohibited by § 77e(a) (1), a violation of which subjected Abrams and Albert to criminal liability. They were not punished, as Abrams contends on appeal, for having an intent to distribute when they took the unregistered Automatic stock, but for the subsequent distribution itself.

■ ■ The "change of circumstances" doctrine to which appellants refer, is wholly inapposite. That doctrine applies to the situation where the original taking of unregistered stock is for investment purposes. If subsequently, there is a change in the financial position of the taker such that the holder is forced to raise money by selling the stock to the public, the courts have said that if the change of circumstances was wholly unforeseeable at the time the stock was originally taken, then the unregistered stock may be distributed without penalty to the seller.[7] The defense that the sales of unregistered Automatic stock were necessitated by the defalcations of Witkin, Abrams' confidential employee, is one which the jury could well have disbelieved. On the other hand, as we have stated above, there was much evidence to show that Abrams and Albert took the stock with an intent to resell to the public and hence, were statutory under-

---

6. See, 1 Loss, Securities Regulation (2d ed. 1961), pp. 547–557.

7. See, 1 Loss, Securities Regulation (2d ed. 1961), pp. 665–667.

writers who were required to see that a registration statement had been filed before they could distribute Automatic stock to the public.

## IV. WHETHER ABRAMS SECURED IMMUNITY BY TESTIFYING BEFORE AN EXAMINER OF THE SEC

Abrams claims that because he appeared before the Regional Office of the SEC in response to a subpoena *duces tecum* on June 19, 1956 and on five subsequent occasions, and because he gave testimony regarding purchases and sales of stock and business transactions concerning Automatic, Bellanca, Pierce Governor and other corporations he secured immunity by reason of 15 U.S.C. § 77v(c) [8] and that it was error for Judge Tyler to deny this claim.[9] We do not agree.

Abrams gained no immunity by merely appearing in response to a subpoena. The statute expressly confers immunity only as to those matters concerning which a witness is compelled to testify after he had claimed his privilege against self-incrimination.[10] Abrams was not compelled to answer any questions as to which he claimed immunity. The only questions he answered were those as to which no claim of privilege had been made. He gave no testimony at the first hearing and at all five subsequent hearings he appeared with counsel. In fact, the record clearly refutes any possible claims of compelled testimony in violation of Abrams' Fifth Amendment right against self-incrimination, for on October 1, 1957, when Abrams and his attorney, Ganson Purcell, a former Chairman of the SEC, appeared before Senior Trial Attorney Arthur Goldman in the New York Regional Office of the SEC the following transpired:

"Mr. Goldman: As you know, Mr. Abrams, this is an investigation of the Commission to determine whether any of the Acts administered by the Commission have been violated, more particularly Sections 5 and 17 under the Securities Act of 1933, Sections 9 and 10 under the Securities and Exchange Act of 1934.

"As you may know, these Sections generally deal with registration requirements in the sale and distribution of securities, fraud in the sale and offer of sale of securities, and manipulative practices used in trading securities.

"Let the record show that Mr. Abrams appeared here on June 19, 1956, June 21, 1956 and July 5, 1956.

"As you will recall, Mr. Abrams, you took the Fifth Amendment with respect to the more substantive questions I asked you on those occasions.

"I want the record to show that Mr. Abrams appears here voluntarily with the understanding that he is not going to plead the Fifth Amendment. I use

---

8. 15 U.S.C. § 77v. Jurisdiction of offenses and suits

"(c) No person shall be excused from attending and testifying or from producing books, papers, contracts, agreements, and other documents before the Commission, or in obedience to the subpena of the Commission or any member thereof or any officer designated by it, or in any cause or proceeding instituted by the Commission, on the ground that the testimony or evidence, documentary or otherwise, required of him, may tend to incriminate him or subject him to a penalty or forfeiture; but no individual shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he is compelled, after having claimed his privilege against self-incrimination, to testify or produce evidence, documentary or otherwise, except that such individual so testifying shall not be exempt from prosecution and punishment for perjury committed in so testifying."

9. We note that although Abrams appeared before the Regional Office of the SEC in 1956 and the indictment was returned in 1961, that the claim of immunity was not raised until January 3, 1964, four months after the trial started. Thus, Judge Tyler could well have denied the claim of immunity on the ground that it was made too late, but he chose not to do so.

10. United States v. Monia, 317 U.S. 424, 429, 63 S.Ct. 409, 87 L.Ed. 376 (1943).

the term 'voluntarily' not in its usual context.

"As you understand, you are still under subpoena, Mr. Abrams?

"Mr. Abrams: Yes.

"Mr. Goldman: I want the record to show this arrangement was volunteered.

"As you know, you still have the right to refuse to answer any questions on the grounds that it may incriminate you or subject you to fine, penalty or forfeiture. I do not want to create a situation here where you are being forced to waive your right to plead the Fifth Amendment.

"I take it here that you are represented by Mr. Ganson Purcell as your counsel.

"Mr. Abrams: That's correct.

"Mr. Goldman: Under these circumstances, I take it that you are willing to testify?

"Mr. Abrams: I am, sir.

"Mr. Goldman: Would you be good enough to take the oath?"

Abrams' position is that once an individual is subpoenaed to appear before an investigative body and that individual refuses to answer one single question on the grounds that the answer might tend to incriminate him, then the individual is forever immune from prosecution of any kind which stems from the conduct then under investigation. In the alternative, Abrams argues that if the individual pleads the Fifth Amendment at any given hearing and then voluntarily testifies as to the subject matter of the heretofore allegedly privileged answer, then no matter how false and self-serving the answer is, the individual may not be prosecuted for the conduct which was then under investigation.

██ ██ The statute is plain and unambiguous. It requires that a claim of privilege against self-incrimination must be made by an individual *and* that, there-

after, the individual *must be compelled* to testify or to produce records for inspection by the investigative body. Abrams never made a contemporaneous claim of privilege when, on those occasions, he did testify, and, in no event, was he ever compelled to answer any question as to which he claimed his privilege. We find Abrams' claim of immunity to be without merit.[11]

### V. WHETHER ABRAMS AND RICHLAND SHOULD HAVE BEEN TRIED BY THE COURT INSTEAD OF BY THE JURY

██ ██ Abrams argues that it was error for the trial judge to refuse to grant his motion for a limited severance because of the antagonism of his co-defendant, Albert. This claim is answered by our decision in United States v. Cohen, 124 F.2d 164 (2 Cir.1941), cert. denied, 315 U.S. 811, 62 S.Ct. 796, 86 L.Ed. 1210 (1942) where we held that, " * * * the granting of such motions is within the discretion of the trial court and, where the charge against all the defendants may be proved by the same evidence and results from the same series of acts * * * the discretion should not be interfered with." 124 F.2d at 165–166. In the alternative, Abrams argues that his motion for a trial to the court, predicated on the complex nature of the transactions and the statute underlying the indictment, was erroneously denied, even though the government refused to waive a jury trial. This argument was foreclosed by the Supreme Court's decision in Singer v. United States, 380 U.S. 24, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965) where the Court held: "A defendant's only constitutional right concerning the method of trial is to an impartial trial by jury. We find no constitutional impediment to conditioning a waiver of this right on the consent of the prosecuting attorney and the trial judge when, if either refused to consent, the result is simply that the defendant is subject to an impartial trial by jury—the very thing that the Constitu-

11. Compare, United States v. Charles Pfizer & Co., 245 F.Supp. 801 (S.D.N.Y. 1965) involving 15 U.S.C. §§ 32, 33, an entirely different immunity statute.

tion guarantees him." 380 U.S. at 36, 85 S.Ct. at 790.

## VI. WHETHER ABRAMS HAD A RIGHT TO PARTICIPATE IN THE HEARING AFTER TRIAL ON ALBERT'S MENTAL CAPACITY

After the verdict and before sentence, counsel for Albert moved for a hearing, pursuant to 18 U.S.C. § 4244, to determine whether Albert had been competent to stand trial. Judge Tyler held a two-day hearing and found that Albert had been competent. Although Albert does not appeal from this ruling, Abrams complains that the trial judge erroneously denied his motion to participate in the hearing.

Judge Tyler directed that all pertinent medical reports and written material be made accessible to Abrams and he even offered to allow representatives of Abrams to attend the hearing. However, because he felt that the presence of additional parties would unnecessarily complicate what was already a protracted litigation and because counsel for both Albert and for the government strongly opposed Abrams' intervention, Judge Tyler denied Abrams' motion to participate.

 Abrams has not made any showing that he could have been prejudiced by having been denied the right to participate in this hearing, or how his participation would have made one iota of difference or that he was denied any information which could possibly have been relevant to his defense.

## VII. WHETHER A NEW TRIAL SHOULD HAVE BEEN GRANTED BECAUSE OF NEWLY DISCOVERED EVIDENCE

██ ██ Abrams alleges that the trial judge committed error by refusing to grant a post-verdict motion for a new trial made on the basis of newly discovered evidence. Rule 33, Federal Rules of Criminal Procedure. This evidence consisted of two letters and an affidavit sent to the court by Louis Carmick, who had formerly been an officer of Automatic. Carmick had always been available as a witness and the appellants chose not to call him. The motion was properly denied.

It has long been held in this circuit that " * * * a defendant seeking a new trial under any theory must satisfy the district court that the material asserted to be newly discovered is in fact such and could not with due diligence have been discovered before or, at the latest, at the trial." United States v. Costello, 255 F.2d 876, 879 (2 Cir.1958), cert. denied, 357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551 (1958); United States v. Pellegrino, 273 F.2d 570, 572 (2 Cir. 1960).

As for Carmick's opinions that Abrams is " * * * candid, blunt and completely honest," that the trial resulted in " * * * a gross miscarriage of justice" and that Abrams " * * * honestly gave with full sincerity a great deal of his time and effort to help Automatic Washer in its difficulties," these are nothing more than conclusory statements and not evidence.

## VIII. WHETHER ALBERT'S RIGHT NOT TO TESTIFY WAS VIOLATED BY AN OPENING STATEMENT MADE BY KNOHL'S COUNSEL; WHETHER THE COURT SHOULD HAVE GRANTED A MISTRIAL

Albert asserts that his constitutional right not to take the stand and testify was violated by a statement made by Knohl's counsel that Albert would explain Knohl's acts and absolve him when Albert took the stand and testified. He claims that the court erred in denying his motion for a mistrial after this occurred.

The record shows, however, that Knohl's counsel had been led to believe that Albert would take the stand by what Albert and Albert's attorney had told him.

The trial commenced on September 4, 1963. The court permitted defense counsel to make their opening statements at the conclusion of the government's case. Thus, Mr. Singer, Knohl's counsel, made his opening statement on January 6, 1964. The substance of what he said was

that Albert would take the stand and exonerate Knohl; that he would testify exactly how, when and where Automatic stock was delivered to Knohl. Singer argued that whatever Knohl did he did on the word of Albert.

Albert's counsel did not object and Singer continued with his statement. It was only after the following recess and before the jury was brought in that Albert's counsel objected and moved for a mistrial. The court denied the motion. Albert's counsel requested no instruction to the jury.

Albert did not testify, nor did Knohl. Before his summation, Singer requested permission to clarify the remarks made in the opening statement that Albert would exculpate Knohl. The court permitted this reference to Albert's failure to take the stand for the limited purpose of allowing Singer to show why he could not exonerate Knohl in the manner he had promised in his opening, namely, through Albert's testimony.

The trial court fully instructed the jury that a defendant was not required to testify and that his failure to do so could not support any inference of guilt against him. The court said:

"When several defendants are on trial together as in this case, each of them has this right not to testify even if one of the other defendants would like to call him as a witness. I instruct you specifically that you may not draw any inferences or presumptions of any sort favorable or unfavorable from the circumstance that Mr. Singer, Mr. Knohl's attorney, told you in his opening, that he would question Mr. Albert about certain transactions if Mr. Albert took the witness stand; and then, as you know, Mr. Albert ultimately saw fit not to take the witness stand and testify. You should not hold this against Mr. Albert since, as I have already explained to you, it is his right and it is the right of each of the defendants not to testify."

■ Because Albert was responsible for the reference he now objects to and because there was neither objection nor request for a limiting instruction, we think that Albert cannot be heard to complain that his right not to take the stand was violated by the comment of Knohl's counsel.

\* \* \*

We find no error whatsoever in the government's treatment of defense witness Robert Berk of which appellants complain. The briefs charge and counsel at oral argument suggested that Berk was threatened and coerced by the government into changing his testimony. This charge is wholly without support. The record shows that quite the opposite was the fact. Berk voluntarily approached the government's attorneys and was told to consult with his own attorneys before any conversation concerning a change in his testimony could be discussed. In fact, the government itself contacted Berk's attorney and arranged an interview at which Berk was represented by two attorneys: Murray Spett and Stanley Schlesinger. The record also indicates that Berk denied having any fears of government retaliation as a result of adverse testimony and that not once did Berk himself or his attorney accuse the government of using pressure to induce a change in his testimony.

■ We note all these facts because we think we should point out that it is highly improper for counsel on appeal to make groundless charges against fellow members of the bar and officers of this court.

The proof of the appellants' guilt was overwhelming; the trial was fairly and scrupulously conducted. If anything the trial judge was too lenient in the latitude allowed defense counsel and too patient of repetitious arguments and maneuvers of defense counsel which had no merit and served only to lengthen unduly a trial which should not have taken so much time of the court and the jury. We find no error in this record and affirm the convictions.