**UNITED STATES of America,
Appellee,**

v.

**Louis E. WOLFSON and Elkin B. Gerbert,
Defendants-Appellants.**

**No. 411, Docket 31993.**

United States Court of Appeals
Second Circuit.

Argued April 4, 1968.

Decided Dec. 27, 1968.

Certiorari Denied April 1, 1969.

See 89 S.Ct. 1275.

See also D.C., 289 F.Supp. 903.

------◆------

Charles P. Sifton, New York City, (Robert M. Morgenthau, U. S. Atty., for the Southern District of New York, David M. Dorsen, Jay Gold, Lars I. Kulleseid and Abraham D. Sofaer, Asst. U. S. Attys., of counsel), for appellee.

William O. Bittman and Milton V. Freeman, Washington, D. C. (Shea, Gallop, Climenko & Gould, New York City, Arnold & Porter, Washington, D. C., Milton S. Gould and Ronald H. Alenstein, New York City, on the brief), for appellants.

Hogan & Hartson, Washington, D. C., for defendant-appellant Wolfson; Austin S. Mittler, Washington, D. C., Chester Bedell, Jacksonville, Fla., Edgar H. Brenner, Washington, D. C., of counsel.

Bedell, Bedell, Dittmar & Smith, Jacksonville, Fla., for defendant-appellants Gerbert and Wolfson.

Before MOORE, WOODBURY* and SMITH, Circuit Judges.

WOODBURY, Senior Circuit Judge:

It was stipulated at the trial that at all relevant times there were 2,510,000 shares of Continental Enterprises, Inc., issued and outstanding. The evidence is clear, indeed is not disputed, that of these the appellant Louis E. Wolfson himself with members of his immediate family and his right hand man and first lieutenant, the appellant Elkin B. Gerbert, owned 1,149,775 or in excess of 40%. The balance of the stock was in the hands of approximately 5,000 outside shareholders. The government's undisputed evidence at the trial was that between August 1, 1960, and January 31, 1962, Wolfson himself sold 404,150 shares of Continental through six brokerage houses, that Gerbert sold 53,000 shares through three brokerage houses and that members of the Wolfson family, including Wolfson's wife, two brothers, a sister, the Wolfson Family Foundation and four trusts for Wolfson's children sold 176,675 shares through six brokerage houses.

Gerbert was a director of Continental. Wolfson was not, nor was he an officer, but there is ample evidence that nevertheless as the largest individual shareholder he was Continental's guiding spirit in that the officers of the corporation were subject to his direction and control and that no corporate policy decisions were made without his knowledge and consent. Indeed Wolfson admitted as much on the stand. No registration statement was in effect as to Continental; its stock was traded over-the-counter.

The appellants do not dispute the foregoing basic facts. They took the position at the trial that they had no idea during the period of the alleged conspiracy, stipulated to be from January 1, 1960, to January 31, 1962, that there was any provision of law requiring registration of a security before its distribution by a controlling person to the public. On the stand in their defense they took the position that they operated at a level of corporate finance far above such "details" as the securities laws; as to whether a particular stock must be registered. They asserted and their counsel argued to the jury that they

---

* Of the First Circuit sitting by designation.

were much too busy with large affairs to concern themselves with such minor matters and attributed the fault of failure to register to subordinates in the Wolfson organization and to failure of the brokers to give notice of the need. Obviously in finding the appellants guilty the jury rejected this defense, if indeed, it is any defense at all.

The appellants assert numerous claims of error. We shall dispose of the claims more or less in the order of their importance.

Section 5 of the Act, 15 U.S.C. § 77e, in pertinent part provides: "(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

"(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell or offer to buy such security through the use or medium of any prospectus or otherwise; * * *."

However, § 4 of the Act, 15 U.S.C. § 77d, exempts certain transactions from the provisions of § 5 including:

"(1) Transactions by any person other than an issuer, underwriter, or dealer."

The appellants argue that they come within this exemption for they are not issuers, underwriters or dealers. At first blush there would appear to be some merit in this argument. The immediate difficulty with it, however, is that § 4(1) by its terms exempts only "transactions," not classes of persons, see SEC v. Culpepper, 270 F.2d 241, 247 (C.A.2, 1959), and ignores § 2(11) of the Act which defines an "underwriter" to mean any person who has purchased from an issuer with a view to the distribution of any security, or participates directly or indirectly in such undertaking unless that person's participation is limited to the usual and customary seller's commission, and then goes on to provide:

"As used in this paragraph the term 'issuer' shall include, in addition to an issuer, any person directly or indirectly *controlling* or controlled by *the issuer*, or any person under direct or indirect common control with the 'issuer.' " (Italics supplied.)

In short, the brokers provided outlets for the stock of issuers and thus were underwriters. United States v. Re, 336 F.2d 306, 309 (C.A.2, 1964), cert. denied 379 U.S. 904, 85 S.Ct. 188, 13 L.Ed.2d 177 (1964). Wherefore the stock was sold in "transactions by underwriters" which are not within the exemption of § 4(1), supra.

But the appellants contend that the brokers in this case cannot be classified as underwriters because their part in the sales transactions came within § 4(4), 15 U.S.C. § 77d(4), which exempts "brokers' transactions executed upon customers' orders on any exchange or in the over-the-counter market but not the solicitation of such orders."[1] The answer to this contention is that § 4(4) was designed only to exempt the brokers' part in security transactions. Stadia Oil & Uranium Co. v. Wheelis, 251 F.2d 269, 275 (C.A.10, 1957). Control persons must find their own exemptions.

There is nothing inherently unreasonable for a broker to claim the exemption of § 4(4), supra, when he is unaware that his customer's part in the transaction is not exempt. Indeed, this is indicated by the definition of "brokers' transaction" in 17 C.F.R. § 230.154, commonly known as Rule 154 which provides:

"(a) The term 'brokers' transaction' in Section 4(4) of the act shall be deemed to include transactions by a broker acting as agent for the account of any person controlling, controlled by, or under common control with, the

---

1. It is undisputed that the brokers involved in this case did not solicit orders from the appellants.

issuer of the securities which are the subject of the transaction where:

"(4) The broker is *not aware* of circumstances indicating * * * that the transactions are part of a distribution of securities on behalf of his principal."

█ And there can be no doubt that appellants' sale of over 633,000 shares (25% of the outstanding shares of Continental and more than 55% of their own holdings), was a distribution rather than an ordinary brokerage transaction. See Rule 154(6) which defines "distribution" for the purpose of paragraph (a) generally as "substantial" in relation to the number of shares outstanding and specifically as a sale of 1% of the stock within six months preceding the sale if the shares are traded on a stock exchange.

Certainly if the appellants' sales, which clearly amounted to a distribution under the above definitions had been made through a broker or brokers with knowledge of the circumstances, the brokers would not be entitled to the exemption. It will hardly do for the appellants to say that because they kept the true facts from the brokers they can take advantage of the exemption the brokers gained thereby.

█ The appellants' argument that §§ 4 and 5 of the Act are unconstitutionally vague does not call for extended discussion. It will suffice to say that the appellants' defense was not that they misunderstood or misinterpreted the statute but that it was beneath their notice and they knew nothing about it. Under these circumstances we need say no more than that any possible uncertainty in the statute need not trouble us now. There will be time enough to consider that question when raised by someone whom it concerns. United States v. Re, 336 F.2d 306, 315 (C.A.2, 1964), cert. denied 379 U.S. 904, 85 S.Ct. 188, 13 L.Ed.2d 177 (1964), and cases cited.

█ The further argument of the appellants that the concept of "control" stock is unconstitutionally vague and indefinite was considered and rejected in United States v. Re, supra 316. And as already pointed out Wolfson himself on the stand admitted that he was in control of Continental within the ordinary and accepted meaning of that term.

The appellants assert that the government's proof is legally insufficient as to all counts, but particularly as to the substantive ones, for the reason that mere proof of the mailing of sales confirmation slips from the brokers to Wolfson or his agent was not a use of the mails "to sell" unregistered securities within the meaning § 5(a) (1) of the Act. We do not agree.

█ Section 5(a) (1) quoted hereinabove categorically forbids the direct or indirect use of the mails "to sell" securities not registered as the law requires through the use or medium of any prospectus or otherwise. By this language "* * * Congress meant to exert its power to the full constitutional extent permitted by the commerce clause and the postal clause." Schillner v. H. Vaughan Clarke & Co., 134 F.2d 875, 878 (C.A.2, 1943). But this court in that case in holding that delivery by mail of stock certificates to a buyer pursuant to an oral contract of sale was within the statutory definition of "sell" in § 12 of the Act, 15 U.S.C. § 77*l* by dictum conceded, page 878, that the word "sell" "may have a narrower meaning in section 5 than it has in section 12." It said: "It is true that the word 'sell' in the phrase 'to make use of * * the mails to sell' as used in subdivision (a) (1) of section 5 cannot be given a meaning broad enough to include delivery of the stock certificate after sale without making purposeless the phrase in subdivision (a) (2) 'for delivery after sale.'" Nevertheless the general rule is well established that "[W]here one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes'

the mails to be used." Pereira v. United States, 347 U.S. 1, 8, 9, 74 S.Ct. 358, 363, 98 L.Ed. 435, (1954), citing United States v. Kenofskey, 243 U.S. 440, 37 S. Ct. 438, 61 L.Ed. 836 (1917). And it has been held in the Fifth Circuit, Mc-Daniel v. United States, 343 F.2d 785, 788 (C.A.5, 1965), that use of the mails to send a confirmation of a sale to a buyer of stock constituted a use of the mails within the meaning of § 5 of the Act. It has also been so held on more than one occasion in the court below. United States v. Hughes, 195 F.Supp. 795, 799 (S.D.N.Y.1961); United States v. Greenberg, 30 F.R.D. 164, 167 (S.D. N.Y.1962). See also United States v. Kane, 243 F.Supp. 746, 750 (S.D.N.Y. 1965), in which the court, after pointing out that § 5(a) (1) of the Act said nothing about causation or carriage but instead made unlawful the direct or indirect *use* of the mails, said: "This subsection is violated when, in connection with the sale of such stock, the mails are used to transmit an offer or other sales literature, to transport the securities after sale, to remit the proceeds to the seller, to send confirmation slips to the buyer, and perhaps even when used in more tangential ways."

■ We regard this as a correct statement of the law. If anything said in *Schillner*, supra, can be read to the contrary it is to be disregarded. We see no basis upon which to draw any distinction between confirmation of a sale of stock to a buyer and confirmation to a seller since both are essential to a valid sale.

■ It follows that we reject the appellants' further argument that this interpretation of § 5(a) (1) by the court below, with which we agree, erroneously gave venue in the Southern District of New York thereby forcing the defendants-appellants to defend in a district far from their homes where adverse publicity was rife. The matter of proper venue was thoroughly and carefully considered by the court below only to be rejected on the appellants' motion under Rule 21(b) Fed.R.Crim.P. for change of venue to the Middle District of Florida where the appellants had their homes. United States v. Wolfson, 269 F.Supp. 621, 623, 624 (S.D.N.Y.1967). There was no abuse of discretion in this ruling.

We now turn to a variety of other matters which can be disposed of more summarily.

■ There is no merit in the appellants' claim that the grand jury selection process in the Southern District of New York is illegal. This claim has been asserted many times both in this court and in the court below and uniformly rejected. Citation of all the cases would serve no useful purpose. It will suffice to refer to United States v. Kelly, 349 F.2d 720, 778 (C.A.2, 1965), cert. denied 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966), and United States v. Bowe, 360 F.2d 1, 7 (C.A.2, 1966), cert. denied 385 U.S. 961, 87 S.Ct. 401, 17 L.Ed.2d 306 (1966). Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967); Coleman v. Alabama, 389 U.S. 22, 88 S. Ct. 2, 19 L.Ed.2d 22 (1967), and Jones v. Georgia, 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25 (1967), upon which the appellants rely are clearly inapposite.

We find no merit in the appellants' further contention that the indictment should be dismissed because of the prosecutor's misconduct in calling upon the appellants to testify before the grand jury when he knew that on that occasion they would assert their claim of privilege under the Fifth Amendment.

■ The rule is well settled in this circuit that the self-incrimination clause of the Fifth Amendment does not prohibit "the Government from ever summoning before a grand jury one who has become a target of inquiry and is a 'potential' defendant." United States v. Winter, 348 F.2d 204, 207 (C.A.2, 1965), and cases cited, cert. denied 382 U.S. 955, 86 S.Ct. 429, 15 L.Ed.2d 360 (1965). Reaffirmed United States v. Ir-

win, 354 F.2d 192, 198, 199 (C.A.2, 1965), cert. denied 383 U.S. 967, 86 S.Ct. 1272, 16 L.Ed.2d 308 (1966). And this is also the rule in the First Circuit, see Kitchell v. United States, 354 F.2d 715, 720 (C.A.1, 1966), cert. denied 384 U.S. 1011, 86 S.Ct. 1970, 16 L.Ed.2d 1032 (1966). There can be no doubt that both defendants well knew of their constitutional right to remain silent before the grand jury and exercised that right. Moreover the minutes of the proceeding before the grand jury show that the prosecuting attorney fully advised the jurors that they were to draw no inferences adverse to the defendants from their refusal to testify. Nor was the prosecuting attorney's questioning of the defendants before the grand jury in any way improper. He did no more than to test the validity of the defendants' reliance on their constitutional right to remain silent.

 The appellants level a number of objections to the prosecuting attorney's summation to the jury. The trial was hotly contested throughout. Perhaps the prosecuting attorney's allusions in his argument to violent crimes, specifically bank robbery, murder and Ruby's shooting of Oswald were somewhat extreme. But counsel for the appellants went to the other extreme of likening their clients' purported offense to parking too close to a hydrant. The charge that the prosecuting attorney argued the appellants' fraud to the jury when in his opening statement he had asserted that fraud was not involved in the case is not well grounded. The prosecution did no more than argue fraud as a motive for the appellants' failure to register. On this issue evidence of fraudulent activities is relevant. United States v. Abrams, 357 F.2d 539, 546 (C.A.2, 1966), cert. denied 384 U.S. 1001, 86 S.Ct. 1922, 16 L.Ed.2d 1014 (1966). The court below in suggesting that the *Abrams* case was not in point was speaking in another context. Without going into greater detail it will suffice to say that reading the prosecuting attorney's entire summation in conjunction with the court's charge discloses no reversible error.

 The appellants object to the refusal of the court to admit expert testimony from a stock broker offered by them to indicate that they could have sold their stock even though a registration certificate with full disclosure had been on file. The basis for this offer is an isolated statement in the prosecutor's opening statement to the effect that had the appellants filed a registration statement they would not have been able to sell their stock. The statement of the prosecutor may perhaps have been a slip of the tongue for he actually argued to the jury that the appellants *believed* that they might not be able to sell their securities if the facts were known. The court below, considering the entire opening statement including its own pre-trial instructions said: "I do not think any untoward impression was left with the jury and if it could be said that such impression was created, it can be corrected by counsel limiting their arguments to the appropriate issues in the case and by adequate instructions of the court." As another reason for rejecting the offer of expert testimony the court said: "It is our view that no reliable expert technique has yet been developed or perhaps can ever be developed to ascertain with any degree of accuracy the future market price of securities or the effect of events upon it." These reasons are fully adequate to support the court's ruling excluding the proffered expert testimony.

 The appellants submitted several witnesses to testify to the appellants' good reputation. They object to questions asked these witnesses on cross-examination. One of these questions was whether the witness had ever heard that Merritt-Chapman and Scott Corporation, of which appellant Wolfson was chairman of the board, had been convicted for bribing a state official. The appellants complain of lack of proof that Wolfson had anything to do with the event. Another question concerned the witness' knowledge of a consent decree

entered against Wolfson in another action years before permanently enjoining him from further violations of the anti-fraud and anti-manipulative provisions of the Securities Exchange Act of 1934 with respect to purchases of stock of American Motors Corporation. The third question concerned the witness' knowledge of pending indictments against both appellants for filing false statements, perjury and conspiracy to commit fraud in connection with the purchase and sale of Merritt-Chapman and Scott stock. The last two questions were not objected to at the trial and none of the questions are objectionable anyway.

■ "The price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him. The prosecution may pursue the inquiry with contradictory witnesses to show that damaging rumors, whether or not well-grounded, were afloat—for it is not the man that he is, but the name that he has which is put in issue." Michelson v. United States, 335 U.S. 469, 479, 69 S. Ct. 213, 220, 93 L.Ed. 168 (1948). The question asked the appellants' character witnesses on cross-examination fall well within the limits fixed by the *Michelson* case and the court afforded the appellants full protection on this matter in its charge. Moreover, courts of appeals rarely and only on clear showing of prejudice will disturb the ruling of the trial courts on this subject. Michelson v. United States, supra 480, 69 S.Ct. 213.

■ The appellants' contention of error in the charge on the issue of wilfulness is not well founded. They contend that their "plain" defense was that they believed registration was not required when a controlling individual desired to sell his stock in an unlisted corporation such as Continental Enterprises, and assert that the court's charge deprived them of this defense. In the first place it is not clear that this was the appellants' defense. They point to some testimony from Wolfson that he thought there was a difference between listed and unlisted stock, but they completely overlook testimony of Wolfson on the next day explaining that he was confused the day before and was referring to insider reports on stock ownership, where there is a difference, not to registration. The appellants' real defense was that they had never heard of registration requirements applicable to either listed or unlisted stock, and on this issue the instruction was if anything more favorable to them than they were entitled to. Even if properly objected to we see no error in the charge on wilfulness as given.

■ The appellants contend that they were never apprised of the "gist" of the accusation against them until the close of the case. They argue that because they did not know how they were said to have violated § 5 they were not able to make proper defense. Even if they were prejudiced when their defense was ignorance of the law the contention has no basis in the record. It is clear that the appellants were fully apprised of the charges against them at the hearing on their pre-trial motion to dismiss. See United States v. Wolfson, 269 F. Supp. 621 (S.D.N.Y.1967).

Their further assertion that the court below prejudicially interrogated their witnesses, particularly themselves when on the stand in their own defense, is equally without foundation in the record. The court's questions show no prejudice. They were designed only to clarify not to embarrass. The court did not by any means take over the prosecution for the Government.

In conclusion it will suffice to say that full consideration of the voluminous record in this rather technical case discloses no reversible error.

Affirmed.