Thomas J. BYRNES and Francis R. Santangelo, Plaintiffs-Appellants,

v.

FAULKNER, DAWKINS & SULLIVAN and Singer & Mackie, Inc., Defendants-Appellees.

FAULKNER, DAWKINS & SULLIVAN, Counterclaim-Plaintiff, Appellee, Appellant,

v.

Thomas J. BYRNES and Francis R. Santangelo, Counterclaim-Defendants, Appellants, Appellees,

and

Tobey & Kirk, Counterclaim-Defendant-Appellee.

Nos. 267, 673, Dockets 76–7259, 76–7276.

United States Court of Appeals, Second Circuit.

Argued Dec. 8, 1976.

Decided March 1, 1977.

As Amended April 4, 1977.

---

Reginald Leo Duff, New York City (Carro, Spanbock, Londin, Rodman & Fass, New York City, of counsel), for plaintiffs-appellants.

I. Michael Bayda, New York City (Norman Trabulus, Jacobs, Persinger & Parker, New York City, of counsel), for defendant-appellee Faulkner, Dawkins & Sullivan.

Before MEDINA, HAYS * and OAKES, Circuit Judges.

OAKES, Circuit Judge:

These appeals are by would-be sellers of stock from decisions granting one buyer judgment on its "second affirmative defense" to the sellers' suit for breach of contract and dismissing claims against a secondary buyer for lack of subject matter jurisdiction. The first buyer cross-appeals from a dismissal of its counterclaims for punitive damages and lost profits it would have obtained on a resale of part of the shares agreed to be sold. The principal issue on appeal is whether the United States District Court for the Southern District of New York, Henry F. Werker, *Judge,* correctly upheld the affirmative defense of the appellee-buyer, a broker-dealer, that the contract for sale of stock was unenforceable because the written "comparison" sent to it by appellant sellers' agent constituted a prospectus as defined in Section 2(10) of the Securities Act of 1933 (the 1933 Act), 15 U.S.C. § 77b(10), did not contain the information required of a prospectus by Section 10 of that Act, 15 U.S.C. § 77j, and was therefore unlawful under Section 5(b)(1), 15 U.S.C. § 77e(b)(1). 413 F.Supp. 453, 459–64 (S.D.N.Y.1976). We affirm the judgments.

*Facts*

Insofar as here relevant, the facts were stipulated below and are not in dispute. Byrnes, Santangelo, and their associates

---

* Judge Hays, owing to illness, has not formally concurred in this opinion, but we believe him to agree with the result reached.

(hereinafter sellers or appellants) were the owners of 148,000 shares of stock of White Shield Corp. on and after September 6, 1968. This stock had been acquired from certain officers or directors of White Shield. It was not registered under the 1933 Act and therefore could not readily be sold, but appellants had acquired the right to include the stock in a registration statement filed at some future time under the Act.

In 1971 White Shield filed several registration statements under the Act. Appellants' stock was included in one that was a so-called "shelf registration" or "shelf secondary," that is, a registration statement filed on behalf of certain named owners of theretofore unregistered shares who, the statement indicates, could then sell the stock in the open market "from time to time," generally through member firms of the National Association of Securities Dealers, Inc. (NASD). The prospectus offering for sale appellants' shares and those of some 25 other selling shareholders bears the same date that the registration statement gained final Securities and Exchange Commission (SEC) approval or "became effective": June 7, 1971. Just before June 7, appellants arranged with Tobey & Kirk, a securities broker-dealer registered with the SEC and a member firm of the NASD, to sell their stock when the registration statement became effective, and appellants delivered to Tobey & Kirk copies of a preliminary or "red herring" prospectus.

On June 7, 1971, Tobey & Kirk agreed to sell to Faulkner, Dawkins & Sullivan (hereinafter Faulkner, buyer, or appellee), at a price of $14 per share, 44,000 shares of the White Shield stock owned by appellants and included in the White Shield registration statement. At that time Faulkner was a "market-maker"[1] in White Shield stock and regularly entered bid and asked quotations in the "Pink Sheets" of the National Quotation Bureau, Inc., and in NASDAQ, the automated quotation system of the NASD. On or about June 7, 1971, Faulkner sent a written "comparison" or confirmation of the purchase to Tobey & Kirk, showing that Faulkner was a market-maker in White Shield stock, and Tobey & Kirk on the same day sent a written comparison of the sale to Faulkner. This latter comparison did not show that the stock was part of a registered distribution, and it was not preceded or accompanied by a prospectus.

Only with delivery of the stock certificates themselves on June 15, 1971, did Tobey & Kirk deliver a prospectus to Faulkner. At that time Faulkner rejected the securities and informed Tobey & Kirk that the transaction was illegal.[2] The prospectus identified the selling shareholders and said that both they and the participating members of the NASD who rendered assistance to them in connection with the sale "may be deemed to be underwriters as that term is defined in the [1933 Act]."

In respect to the counterclaim here in suit, on June 7, 1971, following the agreement with Tobey & Kirk, Faulkner agreed to sell to Singer & Mackie, Inc., a broker-dealer, 15,000 shares of White Shield at 14⅛ per share for a markup of $1,875, the amount sought as compensatory damages by Faulkner in the counterclaim. That trade was cancelled without penalty when Faulkner rejected the securities proffered by Tobey & Kirk.

---

**1.** The term "market-maker" refers to a broker-dealer who, with respect to a particular security that is not traded on a national securities exchange (an "over-the-counter" security), "report[s] for quotation 'bid' and 'asked' prices to indicate, respectively, amounts for which it propose[s] to buy or sell the stock." *Opper v. Hancock Securities Corp.,* 250 F.Supp. 668, 671 (S.D.N.Y.) (Frankel, J.), *aff'd,* 367 F.2d 157 (2d Cir. 1966) (per curiam).

**2.** The apparent reason for Faulkner's refusal was that it was only when the prospectus information was received that Faulkner found out that the stock it had just agreed to purchase was part of a registered secondary distribution. Because Faulkner made a market in White Shield, such a purchase was of doubtful legality. *Compare In re Jaffee & Co.,* [1969–1970 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 77,-805 (SEC 1970), *with In re Collins Securities Corp.,* [1975–1976 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 80,327 (SEC 1975); *see* H. Bloomenthal, *Securities and Federal Corporate Law* § 6.17 (1975).

Appellants subsequently resold the rejected White Shield stock in the open market for considerably less than the $14 per share purchase price of the June 7, 1971, agreement. They then brought suit in the Supreme Court of New York County, alleging breach of contract and repudiation without just cause. In that suit Faulkner's answer asserted nine affirmative defenses, three alleging violations of the 1933 Act, three alleging violations of the Securities and Exchange Act of 1934, and three, relating primarily to the amount of damages, invoking state law or NASD regulations relative to resales. Appellants then filed an action in the United States District Court, seeking a declaratory judgment that the federal defenses to the state court suit were insufficient as a matter of law, but seeking no damages; the parties agreed to stay the state action pending the federal court decision. In federal court Faulkner reasserted the same nine defenses it had asserted in state court and added three counterclaims, the first for a declaratory judgment of the sufficiency of the defenses, the second charging a violation of SEC Rule 10b-6 and seeking compensatory and punitive damages, and the third charging a violation of Rule 10b-5 and seeking the identical compensatory and punitive damages. An opinion of then District Judge Murray I. Gurfein, reported at 362 F.Supp. 864 (S.D.N.Y. 1973), dismissed the federal action brought by appellants for lack of subject matter jurisdiction but found that federal jurisdiction did exist over the counterclaims asserted by Faulkner under Section 17 of the 1933 Act, 15 U.S.C. § 77q, and Section 10 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j.[3] So finding, Judge Gurfein granted appellants leave to answer the counterclaims and to assert as their own counterclaims the breach of contract claims that formed the basis for the original suit; the judge did so on the basis that they were cognizable in federal court as compulsory counterclaims under Fed.R.Civ.P. 13(a), a conclusion not challenged here. Thus, in the peculiar procedural posture of this case, appellants' "counterclaims" really restate their original claims as plaintiffs in federal court. The action was then heard by Judge Werker, who issued the substantive judgment appealed from here, following upon an agreed statement of certain facts and affidavits supporting cross motions for summary judgment.

### The Affirmative Defense

Faulker's "second affirmative defense," on which it prevailed by summary judgment below, was that its contract with appellants should not be enforced because Section 5(b)(1) of the 1933 Act, 15 U.S.C. § 77e(b)(1), was violated. The violation was a result, the defense runs, of Tobey & Kirk's omission to disclose the information that the Act requires to be in a prospectus when Tobey & Kirk sent its "comparison" to Faulkner. Section 5(b)(1) makes it "unlawful for any person, directly or indirectly to make use of any means . . . of . . . communication in interstate commerce . . . to carry or transmit any prospectus relating to any security with respect to which a registration statement has been filed . . . unless such prospectus meets the requirements of [Section 10 of the Act, 15 U.S.C. § 77j]." Section 10 essentially requires the prospectus, or selling circular, to contain or be accompanied by a document that includes the information found in the registration statement itself. It is conceded that Tobey & Kirk's comparison did not satisfy the requirements of Section 10.

Appellants' first response is based upon their reading of Section 2(10) of the 1933 Act, 15 U.S.C. § 77b(10), which states, however, that "unless the context otherwise

---

**3.** A second defendant, Singer & Mackie, Inc., asserted no counterclaims, and hence appellants' claims against it remained dismissed. Appellants argue briefly that Judge Gurfein's original jurisdictional decision was wrong and that therefore Singer & Mackie should once again be made a defendant. It is conceded, however, that appellants' substantive claims against Faulkner and Singer & Mackie rise or fall together, and, in view of our decision affirming summary judgment for Faulkner, we need not decide the jurisdictional question, a question that has not been fully argued and that cannot affect our result.

requires . . . [t]he term 'prospectus' means any prospectus, notice, circular, advertisement, letter, or communication . . which offers any security for sale *or confirms the sale of any security* . . ." (emphasis added). Appellants admit, as they must, that their comparison falls within the literal terms of Section 2(10), but they argue, relying on the caveat "unless the context otherwise requires," that a comparison should not be deemed a prospectus in the context of an interbroker confirmation. They do recognize, however, that the party seeking to avoid the explicit language of the statute has the burden of proof. *Exchange National Bank v. Touche Ross & Co.,* 544 F.2d 1126, 1137–1138 (2d Cir. 1976).

■ Appellants direct us to the history of Section 2(10), pointing out that its original language did not specifically mention confirmations. In 1941, however, the SEC's general counsel issued an opinion to the effect that the term "prospectus" included "within its meaning an ordinary confirmation," as well as "every kind of written communication . . . which constitutes a contract of sale or disposition of a security for value." Securities Act Release No. 2623 (1941), *reprinted in* 11 Fed.Reg. 10964 (1946). A 1954 statutory amendment incorporated this opinion in substance into the language of Section 2(10) of the 1933 Act as quoted above; the congressional committee reports explicitly referred to the 1941 opinion and stated that the amendment was adopted in order to avoid any implied repeal of "settled interpretations" of the original text of Section 2(10). S.Rep. No. 1036 at 12, H.R.Rep. No. 1542 at 21, 83d Cong., 2d Sess. (1954), U.S. Code Cong. & Admin. News 1954, p. 2973.

Appellants attempt to avoid this consistent and straightforward history with an elaborate argument, set out in the margin,[4]

---

4. Appellants argue that each of the general counsel's answers to the eleven hypothetical questions making up the bulk of his 1941 opinion, Securities Act Release No. 2623 (1941), *reprinted in* 11 Fed.Reg. 10964 (1946), can be explained by reference to specific provisions of the 1933 Act exempting transactions from the prospectus-delivery requirements of Section 5, 15 U.S.C. § 77e. The first five of these questions and answers involve offers to sell or solicitations of orders to buy made by a dealer to his own customer and are not directly relevant to the instant case. Question and Answer 6, which state that prospectus requirements do not apply to purchase transactions executed by a broker upon the unsolicited instructions of his customer, are explained, appellants say, by Section 4(4) of the Act, 15 U.S.C. § 77d(4), which exempts unsolicited brokers' transactions from Section 5's provisions. Similarly, in Question and Answer 7, involving an unsolicited sell order given by the customer to his broker, it is stated that the broker need not send a prospectus along with the confirmation of the sale.

Question and Answer 8, on which appellants most heavily rely, we reprint in full:

*Question 8.* Pursuant to the sell order received in Question 7, John Doe [the broker] sells [his customer] Richard Roe's warrants to Henry Hoe, another dealer, who purchases for his own account. Must John Doe, in confirming the sale to Henry Hoe, or in delivering the warrants to him, send him a copy of the prospectus?

*Answer.* No. John Doe, in making the sale, is completing the execution of an unsolicited brokerage order, and therefore is exempt from the prospectus requirements.

Appellants' brief rather condescendingly states that the general counsel's conclusion is correct for the wrong reasons. Counsel is said to be wrong because he invoked the Section 4(4) unsolicited transaction exemption when he should have invoked the Section 4(1) exemption, relating to a transaction by a person who is not an "issuer, underwriter, or dealer." On the other hand, if Henry Hoe, the purchasing dealer, were a market-maker who inserted bids in the Pink Sheets, as was Faulkner here, appellants argue that that fact might support the Section 4(4) exemption, since John Doe's call to him would then not constitute solicitation.

Question 9 in the 1941 opinion assumes that a broker solicits a sell order from his customer, and the answer holds that no prospectus need be delivered to the customer with the solicitation, since the broker is offering to sell for, not to, the customer. Question 10 assumes the facts of Question 9 and that the customer gives the sell order to his broker, who in turn sells the rights to a purchasing dealer. The answer to Question 10 was that the transaction, although on a brokerage basis, results from a solicitation, and consequently the prospectus requirements are applicable to the broker-to-dealer sale. Appellants conclude that Answer No. 10 is wrong. The argument is that the right to receive a prospectus is the buyer's right and should not depend on whether the selling stockholder gave his broker an unsolicit-

directed at showing, through the language of the general counsel's 1941 opinion, that since a prospectus was not meant to be delivered in an inter-broker comparison situation, the confirmation is not a prospectus. To a degree, this argument confuses the definition of a prospectus with the exemptions from the prospectus delivery requirement, which will be discussed *infra*. On the definition of a prospectus, however, the general counsel's opinion is quite explicit. It states that *any* confirmation is a prospectus, a conclusion adopted in the 1954 statutory amendment. The general counsel's opinion, in discussing situations in which the 1933 Act provides exemptions from the prospectus delivery requirements, does have its opaque moments, *see* note 4 *supra,* but none are sufficient to help appellants meet their burden of overcoming the statutory language.

Nor is *In re Collins Securities Corp.,* [1975–76 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 80,327 (SEC 1975), of any help to appellants. The SEC there held only that the Pink Sheets themselves are not prospectuses under Section 2(10) and hence do not have to contain all the information required of a prospectus to avoid a violation of Section 5, *Collins* holds, and we agree, that Section 2(10) need not literally apply if reason indicates otherwise. There the Com-

mission was faced with the practical difficulties that would ensue if Pink Sheets were treated as prospectuses. It was the perfect illustration of a situation in which "the context" required Section 2(10) not to be read literally. A sale by an underwriter through a broker to a broker-dealer is quite different. Here, the only consequence of our decision will be that the selling broker will have to accompany his first written communication to the purchasing broker with a Section 10(a) prospectus. This requirement accords with the congressional vision of the prospectus as a document to be read by the would-be purchaser before the sale becomes legally binding. *See Diskin v. Lomasney & Co.,* 452 F.2d 871, 876 (2d Cir. 1971). Since sellers' confirmations can meet statute of frauds requirements if the purchaser does not send written objections within ten days after receipt, U.C.C. § 8–319(c), the time of delivery of the confirmation is the logical time for delivery of the prospectus.

While we therefore hold that a comparison is a prospectus for purposes of the 1933 Act, this holding is not the end of our inquiry. Section 4 of the Act, 15 U.S.C. § 77d, provides exemptions from the prospectus delivery requirements for specified types of transactions,[5] and appellants assert

---

ed sell order, as in Question 8, or was himself solicited to sell, as in Question 10.

Appellants go on to say that, if they are right and the general counsel was wrong, the proper exemption for Questions 8 and 10 is Section 4(1) rather than Section 4(4). Since the application of Section 4(1) requires a determination of *whether Tobey & Kirk was acting as an* underwriter, and since the court below held that the facts on this question were in dispute, appellants conclude that summary judgment should not have been granted. In the alternative they argue that the facts of this case most closely fit those of Question 8, in which the general counsel concluded no prospectus was required. It should be noted that appellants' position is to some extent undercut by the fact that Questions and Answers 8 and 10 were expressly "supersede[d]" in 1951, Securities Act Release No. 3421, by SEC Rule 154 (rescinded in 1972), which clarified the use of the term "brokers' transactions" in Section 4(4) of the Act in a manner unfavorable to appellants' claims.

5. Section 4 of the Securities Act of 1933, 15 U.S.C. § 77d, provides:

The provisions of section 77e of this title [section 5 of the Act] shall not apply to—

(1) transactions by any person other than an issuer, underwriter, or dealer.

(2) transactions by an issuer not involving any public offering.

(3) transactions by a dealer (including an underwriter no longer acting as an underwriter in respect of the security involved in such transaction), except—

(A) transactions taking place prior to the expiration of forty days after the first date upon which the security was bona fide offered to the public by the issuer or by or through an underwriter,

(B) transactions in a security as to which a registration statement has been filed taking place prior to the expiration of forty days after the effective date of such registration statement or prior to the expiration of forty days after the first date upon which the security was bona fide offered to the public by

that the transaction at issue here was exempt. Keeping in mind that one who would plead such an exemption has the burden of proof, *SEC v. Ralston Purina Co.,* 346 U.S. 119, 126, 73 S.Ct. 981, 97 L.Ed. 1494 (1953), however, we find that none of the Section 4 exemptions is applicable here.

■ Section 4(1) exempts "transactions by any person other than an issuer, underwriter, or dealer." While appellants argue that Tobey & Kirk was not one of these, Tobey & Kirk concededly was registered as a securities broker-dealer with the Securities and Exchange Commission and was a member firm of the NASD. "Dealer" is defined in Section 2(12), 15 U.S.C. § 77b(12), to include "any person who engages either for all or part of his time, directly or indirectly, as agent, broker, or principal, in the business of offering, buying, selling, or otherwise dealing or trading in securities issued by another person." Clearly Tobey & Kirk was a dealer, *see United States v. Crosby,* 294 F.2d 928, 939 (2d Cir. 1961), *cert. denied,* 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962), if not also an underwriter, *see SEC v. Chinese Consol. Benev. Ass'n,* 120 F.2d 738, 740–41 (2d Cir.) (A. Hand, J.), *cert. denied,* 314 U.S. 618, 62 S.Ct. 106, 86 L.Ed. 497 (1941).

Section 4(2) is inapplicable on its face; it exempts "transactions by an issuer not involving any public offering." Section 4(3) exempts the usual transaction by a dealer,

but not, *inter alia,* those which take place prior to the expiration of 40 days from the date the relevant registration statement becomes effective. Here, because the transaction occurred within that 40-day period, Section 4(3) does not provide an exemption.

■ Appellants might draw most comfort from Section 4(4), which exempts "brokers' transactions executed upon customers' orders on any exchange or in the over-the-counter market but not the solicitation of such orders," but we hold that it too is inapplicable to this sale. Appellants were themselves distributing stock in a registered offering, which makes their position quite different from that of the broker in Question No. 8 of the 1941 general counsel's opinion, on which appellants rely, *see* note 4 *supra.* As distributors of newly registered stock, appellants were subject to the requirements of Section 5 of the Securities Act, regardless whether their broker was an underwriter. *See United States v. Wolfson,* 405 F.2d 779, 782–83 (2d Cir. 1968), *cert. denied,* 394 U.S. 946, 89 S.Ct. 1275, 22 L.Ed.2d 479 (1969).[6] The definition of underwriter in Section 2(11), 15 U.S.C. § 77b(11), includes one who "participates or has a direct or indirect participation in any [distribution of any security by an issuer], or participates or has a participation in the direct or indirect underwriting of any such undertaking."[7] Appellants and their asso-

---

the issuer or by or through an underwriter after such effective date, whichever is later (excluding in the computation of such forty days any time during which a stop order issued under section 77h of this title [section 8 of the Act] is in effect as to the security), or such shorter period as the Commission may specify by rules and regulations or order, and

(C) transactions as to securities constituting the whole or a part of an unsold allotment to or subscription by such dealer as a participant in the distribution of such securities by the issuer or by or through an underwriter.

With respect to transactions referred to in clause (B), if securities of the issuer have not previously been sold pursuant to an earlier effective registration statement the applicable period, instead of forty days, shall be ninety days, or such shorter period as the

Commission may specify by rules and regulations or order.

(4) brokers' transactions executed upon customers' orders on any exchange or in the over-the-counter market but not the solicitation of such orders.

6. Appellants' distinction of *Wolfson* as involving unregistered securities is one without a difference. The *Wolfson* appellants were held not entitled to exemptions under either Section 4(1) or Section 4(4), the latter being held to exempt only the brokers' part in security transactions. 405 F.2d at 782.

7. Section 2(11) of the Securities Act of 1933, 15 U.S.C. § 77b(11), provides:

When used in this subchapter, unless the context otherwise requires—

. . . . .

The term "underwriter" means any person who has purchased from an issuer with a

ciates arranged to have their stock included in one of the White Shield registration statements and were identified as putative underwriters in the White Shield prospectus. Appellants therefore became participants in the White Shield distribution and accordingly became underwriters. *See SEC v. North American Research & Development Corp.,* 424 F.2d 63, 74 (2d Cir. 1970) (purchaser from minority shareholders became underwriter by directly or indirectly participating in distribution); *SEC v. Culpepper,* 270 F.2d 241, 246 (2d Cir. 1959) (defendant an underwriter although stock not purchased from control group). An underwriter who would otherwise be subject to Section 5 requirements plainly does not insulate himself from those requirements by the simple expedient of using a broker to complete his sales transactions. *See United States v. Wolfson, supra,* 405 F.2d at 782; Securities Act Release No. 131 (1934), *reprinted in* 11 Fed.Reg. 10951 (1946) ("Whether the customer [of a broker] is excused from complying with the requirements of Section 5 depends upon his own status or upon the character of the transaction in which he, himself, is engaged. In other words, therefore, an issuer selling through a broker on the stock exchange would be subject to Section 5 of the Act."). As underwriters, appellants have no basis for arguing that they should be relieved of the consequences of Tobey & Kirk's failure to deliver a prospectus.

■■■■ Appellants argue, however, that *In re Collins Securities Corp., supra,* should be read broadly to mean that prospectus requirements do not apply to transactions between brokers, since the purpose of the 1933 Act—the protection of individual investors—is not thereby served. But a broker-dealer's individual investor customers often rely upon the broker-dealer in making their investment decisions. It would exalt form over substance not to require that the broker receive the prospectus from which in part the ultimate decision may be made. Moreover, neither *Collins* nor Section 4 purports to create a per se exemption for transactions in which the purchaser is a broker-dealer; the scheme of Section 4 is to make the type of transaction the dispositive factor. *United States v. Rachal,* 473 F.2d 1338, 1342 n.2 (5th Cir.), *cert. denied,* 412 U.S. 927, 93 S.Ct. 2750, 37 L.Ed.2d 154 (1973); *United States v. Wolfson, supra,* 405 F.2d at 782.

■■■■ Appellants further suggest that a market-maker who is publishing his offers to purchase may be presumed to have a prospectus. *Cf. Gruss v. Curtis Publishing Co.,* 534 F.2d 1396, 1403 (2d Cir.) (contributory negligence by sophisticated beneficial owner of stock, who was head of investment firm, barred recovery for failure to assert state law appraisal rights), *cert. denied,* 429 U.S. 887, 97 S.Ct. 240, 50 L.Ed.2d 168 (1976). While this argument might be persuasive with regard to shares as to which a registration statement had previously become effective, or as to shares sold on an exchange (where SEC Rule 153 would require that an adequate number of copies of the prospectus be available, *see* 413 F.Supp. at 463), rather than over the counter as here, it does not persuade us in the instant case. Here a registration statement was filed and became effective only on the date of the over-the-counter sale. *Cf. Barnes v. Osofsky,* 373 F.2d 269 (2d Cir. 1967) (buyer of securities not sold on registration statement not allowed 1933 Act § 11 remedies); *Colonial Realty Co. v. Brunswick Corp.,* 257 F.Supp. 875 (S.D.N.Y.1966) (same); 3 L. Loss, *Securities Regulation* 1731 n.160 (1961) (same).

■■■■ Appellants' penultimate argument is that they should be protected under

view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking; but such term shall not include a person whose interest is limited to a commis-

sion from an underwriter or dealer not in excess of the usual and customary distributors' or sellers' commission. As used in this paragraph the term "issuer" shall include, in addition to an issuer, any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer.

Section 19(a) of the 1933 Act, 15 U.S.C. § 77s(a),[8] by virtue of their good faith conformity with, if not reliance upon, the above-cited 1941 general counsel's opinion. But Section 19 is not applicable unless there has been conformity with an SEC rule, regulation, or at least a "general understanding . . . regularly given effect by the Commission's able staff in dealing with lawyers who specialize in SEC matters" or "an article of faith among lawyers specializing in the securities field." *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1293, 1294 (2d Cir. 1973) (Securities Exchange Act of 1934). Appellants' reliance on the general counsel's opinion does not meet these requirements; at best appellants' argument, *see* note 4 *supra,* is an elaborately reasoned interpretation directly contrary to literal language.

 Finally, appellants argue that, even if there has been a violation of the 1933 Act, their contract with Faulkner is still enforceable. While a contract that violates the Act may not be voided if to do so would hinder the purposes of the Act, *A. C. Frost & Co. v. Coeur d'Alene Mines Corp.*, 312 U.S. 38, 43, 61 S.Ct. 414, 85 L.Ed. 500 (1941), it is certainly voidable when the purposes of the Act are thereby furthered, *Kaiser-Frazer Corp. v. Otis & Co.*, 195 F.2d 838, 843–44 (2d Cir.) (A. Hand, J.) (in sale by issuer to underwriters as initial step in public offering of securities, contract voided because of misleading statement in the prospectus), *cert. denied,* 344 U.S. 856, 73 S.Ct. 89, 97 L.Ed. 664 (1952). *Accord, General Life of Missouri Investment Co. v. Shamburger,* 546 F.2d 774 at 784 (8th Cir. 1976). Since Section 12(1) of the 1933 Act, 15 U.S.C. § 77l(1) gives an absolute right of rescission to an innocent purchaser of securities offered or sold in violation of the

prospectus requirements, it would be anomalous to require that a buyer pay on a contract that violated those requirements and then sue under Section 12(1) to have his money returned. 3 L. Loss, *supra* at 1797–98 (1961); Note, *Enforceability of Underwriting Contracts Illegal Under the Securities Act of 1933,* 73 Harv.L.Rev. 1345, 1354 (1960). Since a violation of the prospectus requirements by Tobey & Kirk has been made out, therefore, Faulkner's contract with appellants is unenforceable.

### The Counterclaims

 Faulkner's counterclaims for $1,875 compensatory damages (the lost profits on the cancelled resale to Singer & Mackie, Inc.) and $1,000,000 punitive damages, at issue on the cross-appeal, were properly dismissed. Wholly apart from the merits of alleged wrongdoing, Faulkner sustained no damages cognizable under either SEC Rule 10b–6 (the Second Counterclaim) or Rule 10b–5 (the Third Counterclaim). Section 28(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78bb(a) (Supp. V 1975), the Act under which the two rules were promulgated, denies recovery to a complainant for any amount "in excess of his actual damages on account of the act complained of." *See also Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 388–89, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). This section on its face precludes recovery of punitive damages. *Globus v. Law Research Service, Inc.,* 418 F.2d 1276, 1286 (2d Cir. 1969), *cert. denied,* 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970); *Green v. Wolf Corp.,* 406 F.2d 291, 302–03 (2d Cir. 1968), *cert. denied,* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969). As to the loss of anticipated profits, whether or not such a loss is

---

**8.** Section 19(a) of the Securities Act of 1933, 15 U.S.C. § 77s(a), provides in pertinent part:

The Commission shall have authority from time to time to make, amend, and rescind such rules and regulations as may be necessary to carry out the provisions of this subchapter, including rules and regulations governing registration statements and prospectuses for various classes of securities and issuers, and defining accounting, technical, and trade terms used in this subchapter. . . . No provision of this subchapter imposing any liability shall apply to any act done or omitted in good faith in conformity with any rule or regulation of the Commission, notwithstanding that such rule or regulation may, after such act or omission, be amended or rescinded or be determined by judicial or other authority to be invalid for any reason.

recoverable as an item of consequential damages, *compare Zeller v. Bogue Electric Manufacturing Corp.*, 476 F.2d 795, 803 (2d Cir.), *cert. denied,* 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973), *with Levine v. Seilon, Inc.*, 439 F.2d 328, 334 (2d Cir. 1971), it must be remembered that the sum of $1,875 was the spread on the sale of .20,000 shares out of 44,000 contracted to be bought. At no time after the cancellations on June 15, 1971, it was stipulated, was the market price of White Shield above $14 per share. If, as Faulkner's brief states, the price had declined from $14 to $12.34 at the settlement date, the loss on the unsold shares would have been $39,840, substantially offsetting the anticipated gain. Thus, far from suffering a proximate loss from the acts of appellants, *see Herpich v. Wallace,* 430 F.2d 792, 810 (5th Cir. 1970), Faulkner was benefited overall by them. For damages purposes under the Exchange Act, the transaction cannot be fractionated, since otherwise "actual damages on account of the act complained of" would be exceeded. *See Abrahamson v. Fleschner,* 392 F.Supp. 740, 746–47 (S.D.N.Y.1975).[9] *See also Wolf v. Frank,* 477 F.2d 467, 478 (5th Cir), *cert. denied,* 414 U.S. 975, 94 S.Ct. 287, 38 L.Ed.2d 218 (1973).

 Nor are the damage claims recoverable under the allegedly pendent state claim for common law fraud or a violation of New York General Business Law § 352–c. While we have permitted joinder of pendent state claims for punitive damages, *see Flaks v. Koegel,* 504 F.2d 702, 706–07 (2d Cir. 1974), and cases cited therein, any "fraud" with which appellants could be charged here would not qualify for an exemplary recovery under New York law, since the violation of Rule 10b–6 or 10b–5 is not alleged to go beyond ordinary fraud, for which punitive damages do not lie, *Walker v. Sheldon,* 10 N.Y.2d 401, 405, 223 N.Y.S.2d 488, 491, 179 N.E.2d 497, 498 (1961) (punitive damages may be awarded only "where

the fraud, aimed at the public generally, is gross and involves high moral culpability"). As to the claim for compensatory damages, Faulkner has had no net out-of-pocket loss here, as noted above.

Inviting as it would be as an academic exercise to delve into the several other claims and cross-claims advanced by the parties under both the 1933 and 1934 Acts and ruled on by the court below, it is unnecessary for us to do so.

Judgments affirmed.

**9.** *Abrahamson v. Fleschner,* No. 75–7203, slip op. 6211 (2d Cir. Feb. 25, 1977), reversed and remanded in part the district court opinion, 392 F. 740 (S.D.N.Y.1975), cited above. In doing so the court emphasized

that it was *not* saying "that a plaintiff where both result from a *single* wrong." Slip op. at 6240 (emphasis in original). That is what Faulkner would have us do here; Bvrnes' act was a *single* one.